**UNITED STATES of America, Appellee,**

**v.**

**Edward Lunn TULL, Appellant.**

**No. 84–1766.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1985.

Decided July 30, 1985.

Richard R. Nageotte, Woodbridge, Va. (Nageotte, Borinsky & Zelnick, Woodbridge, Va., on brief), for appellant.

Claire L. McGuire, Dept. of Justice, Washington, D.C. (F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., Elsie L. Munsell, U.S. Atty., Alexandria, Va., John F. Kane, Asst. U.S. Atty., Norfolk, Va., Diane L. Donley, Martin W. Matzen, Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, SNEEDEN, Circuit Judge, and WARRINER, United States District Judge for the Eastern District of Virginia, sitting by designation.

HARRISON L. WINTER, Chief Judge:

Defendant Tull, a real estate developer, placed fill on "wetlands" without a permit at several locations on the island of Chincoteague, Virginia. The government sued, alleging that this filling violated both the Clean Water Act,[1] 33 U.S.C. § 1251 *et seq.*, and the Rivers and Harbors Appropriation Act, 33 U.S.C. § 401 *et seq.* The district court 615 F.Supp. 610, found Tull had violated both Acts, fined him, and ordered various other remedies. Tull appeals, and we affirm.

### I.

We begin our discussion by summarizing the statutory and factual background of this dispute. We then treat those of appellant's arguments that merit discussion.

### Statutory Background

The Clean Water Act aims "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this purpose, the Act prohibits the discharge without a permit of dredged or fill material into "navigable waters" of the United States. 33 U.S.C. §§ 1311, 1344. The Act authorizes the Secretary of the Army to issue the permits required for such discharges. The Secretary has in turn delegated this authority to the Corps of Engineers. 33 C.F.R. § 325.8 (1984). The Corps evaluates permit applications under guidelines developed by the Environmental Protection Agency in conjunction with the Secretary of the Army. 33 U.S.C. § 1344(b).

---

1. Also known as the Federal Water Pollution Control Act.

The reach of the Clean Water Act extends beyond discharges into waters actually supporting navigation. "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). During the legislative proceedings culminating in the enactment of that section, the Conference Committee explained the legislative intent in defining this term:

The Conferees fully intend that the term "navigable waters" be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes.

S.Conf.Rep. No. 1236, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3776, 3822.

Included in the areas subject to Corps regulation under the Clean Water Act are "wetlands" adjacent to other "waters" of the United States. 33 C.F.R. § 323.2(a)(1)–(7) (1984). "Wetlands" are defined as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted to life in saturated soil conditions." The administrative definition further provides that wetlands "generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 323.2(c) (1984).

The Rivers and Harbors Act, which defendant Tull was also found to have violated, prohibits placing fill in navigable waters without the authorization of the Secretary of the Army. 33 U.S.C. § 403. This Act defined "navigable waters" at the time of Tull's alleged violation as waters that "have been used in the past, are now used, or are susceptible to use" for interstate commerce, and waters subject to the ebb and flow of the tide. 33 C.F.R. § 209.-260(k)(2) (1975), superseded by 33 C.F.R. § 329.4 (1984) (similar definition).

*Factual Background*

The government sued Tull in July of 1981 for dumping fill at three locations in violation of the Clean Water Act:

(1) Ocean Breeze Mobile Homes Sites;

(2) Mire Pond Properties

(3) Eel Creek.

The government later amended its complaint to allege that by placing fill in Fowling Gut Extended, a manmade waterway on the Ocean Breeze property, Tull also violated the Rivers and Harbors Act.

The evidence at a 15-day bench trial showed that Tull began placing fill on the Ocean Breeze property in 1975, on the Mire Pond properties in 1978, and on the Eel Creek property sometime after December of 1980. Tull filled in Fowling Gut Extended, a body of water described as a canal or ditch, beginning in 1976. Tull never applied for a permit to place fill at any of these locations.

Tull did not deny that he had placed fill at the locations alleged, nor did he claim that he had ever applied for a permit. Rather, he argued that the properties filled did not contain wetlands within the meaning of the Clean Water Act, and that Fowling Gut Extended was not navigable within the meaning of the Rivers and Harbors Act. He further argued that the government was estopped from seeking equitable relief, and that the Clean Water Act as applied to him was unconstitutional.

On the issue of whether the filled properties contained wetlands, the government produced at trial extensive evidence, including 12 expert witnesses, to establish that the areas filled by Tull included "wetlands" within the jurisdiction of the Corps of Engineers. Buried soil analysis showed the presence of peat, which develops only in a wetlands system. Vegetation analysis showed the presence of "obligate" wetlands species, which require saturated soil conditions. Expert testimony established tidal influence and some degree of inundation.

Dr. Donna Ware, a court-appointed expert, agreed with the conclusions of the government witnesses, finding wetlands existed on the properties in question. Mr. Ronald Beebe, a civil engineer testifying

for Tull, disagreed. His opinion that certain filled areas were not within Corps jurisdiction, however, was based not on the regulatory definition of wetlands, but on the fact that the developed sections lay above the high-water mark. The district court supplemented the extensive expert testimony by conducting a viewing of the filled areas.

The evidence on Fowling Gut Extended showed that the federal government had spent $30,000 in 1963 for construction of a drainage ditch to control mosquito breeding. One witness testified that boats could travel up this ditch or canal, at least for a short time, and that it was subject to the ebb and flow of the tide.

The district court concluded there was "substantial, credible evidence" that Tull had filled areas "typically tidal, marsh or bog in character" on all the properties in question. It found that Fowling Gut Extended "was navigable in fact and was utilized by boat traffic subsequent to 1963 and prior to the time when [Tull] filled in this waterway without applying for or obtaining any permit from the Army Corps of Engineers." Concluding that Tull had violated both Acts, the district court assessed fines of $75,000 for the filling at Ocean Breeze, Mire Pond, and Eel Creek, and ordered Tull to restore areas on all three properties to wetlands. For filling Fowling Gut Extended, Tull was ordered either to pay a $250,000 fine or to restore the canal "to its former navigable condition."

## II.

*Whether the Clean Water Act or its Application Here is Unconstitutional*[2]

A. *The Commerce Clause*

■ Tull argues that the regulation of his property under the Clean Water Act

goes beyond the proper reach of the commerce clause. The Seventh Circuit rejected this argument in *United States v. Byrd*, 609 F.2d 1204, 1210 (7 Cir.1979). It found that regulating wetlands was justified by the negative effect that destruction of wetlands could have on the "biological, chemical, and physical integrity of the [navigable] lakes they adjoin." *Id.* at 1210. The Supreme Court has cited this discussion in *Byrd* with approval, noting "we agree with the lower federal courts that have uniformly found the power conferred by the Commerce Clause broad enough to permit congressional regulation of activities causing air or water pollution...." *Hodel v. Virginia Surface Mining & Reclamation Assn.*, 452 U.S. 264, 282, 101 S.Ct. 2352, 2363, 69 L.Ed.2d 1 (1981). We follow these authorities and reject defendant's argument.

Tull concedes that there is precedent rejecting his commerce clause argument. He urges, however, that the government already litigated this issue against him and lost, in *United States v. Tull*, No. 75–319–N slip op. (E.D.Va. November 12, 1975). We disagree. Collateral estoppel precludes the government from relitigating "the same issue already litigated against the same party in another case involving virtually identical facts." *United States v. Stauffer Chemical Co.*, 464 U.S. 165, ——, 104 S.Ct. 575, 578, 78 L.Ed.2d 388, 392 (1984). The earlier case against Tull, however, did not present a virtually identical situation, nor was the commerce clause issue squarely presented.

In the earlier case, Tull introduced fill without a permit into an area behind a bulkhead. The district court found that the area was "high and dry most of the time," and "would probably see a little flooding for only two or three hours per

2. Tull made a fifth amendment taking argument in the district court. It, however, rejected the argument on ripeness grounds, and Tull has not reasserted this argument on appeal. A Sixth Circuit panel, we recognize, has narrowly construed the Clean Water Act's regulatory definition of wetlands to avoid what it sees as "a very real taking problem." *United States v. Riverside*

*Bayview Homes, Inc.*, 729 F.2d 391, 398 (6 Cir. 1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 1166, 84 L.Ed.2d 318 (1985). Even *Riverside*'s narrow construction, however, encompasses the swamp, marsh or bog adjacent to navigable waters at issue here. 729 F.2d at 398. *Riverside* would exclude only "inland low-lying areas" from Corps jurisdiction. *Id.* at 398, 401.

month." It lay above the mean high water line, and the district court found it "could not even be said to be 'periodically' flooded" within the meaning of the regulation then defining Corps jurisdiction. *See* 40 Fed.Reg. 31,320 (1975).[3] The district court then suggested in dictum that including land which is "high and dry, above the average high tide" line within federal regulation because it might be periodically inundated "is further than we choose to go." That decision left open the question whether areas that receive sufficient flooding or saturation to support plants adapted to "saturated soil conditions," and that therefore meet the current definition of "wetlands," 33 C.F.R. § 323.2(c) (1984), are constitutionally subject to federal jurisdiction.

### B. *Vagueness*

■ Tull argues that the Clean Water Act regulations are unconstitutionally vague because the imprecise definition of "wetlands" makes it too difficult for landowners to determine their potential liability. We reject this argument, as have other courts. *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 917 (5 Cir.1983); *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181, 1187 (D.Ariz. 1975). As applied to this case, the regulatory definition of wetlands is sufficiently definite to give a person of ordinary intelligence fair notice of what conduct the Clean Water Act prohibits or requires. *Cf. United States v. Harriss,* 347 U.S. 612, 617–18, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954).

### III.

### *Whether Tull Had a Right to a Jury Trial*

■ We find no merit in Tull's claim that he had a right to a jury trial in this case. The seventh amendment right to a jury trial is limited to suits in the nature of an action existing at common law when the amendment was adopted. *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, 458, 97 S.Ct. 1261, 1270, 51 L.Ed.2d 464 (1977); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893 (1937). "... Congress may constitutionally enact a statutory remedy unknown at common law, vesting factfinding in an administrative agency or others without the need for a jury trial." *Republic Industries v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 642 (4 Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

■ Tull urges that he had a right to a jury trial because the government was seeking civil penalties under the Clean Water Act. To support this argument, he points to the Second Circuit's decision in *United States v. J.B. Williams Co., Inc.,* 498 F.2d 414 (2 Cir.1974). The court there found a seventh amendment "right of jury trial when the United States sues ... to collect a [statutory] penalty, even though the statute is silent on the right of jury trial." *Id.* at 422–23 (quoting 5 Moore, Federal Practice ¶ 38.–31[1] at 232–33 (1971 ed.)). In so holding, the Second Circuit found guidance in several older Supreme Court cases. Thus in *Hepner v. United States,* 213 U.S. 103, 115, 29 S.Ct. 474, 479, 53 L.Ed. 720 (1909), the Supreme Court suggested in dictum that "[t]he defendant was, of course, entitled to have a jury summoned" where the government sued to collect a $1,000 civil penalty for violation of the Alien Immigration Act. *See also United States v. Regan,* 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (dictum regarding penalty under Alien Immigration Act).

We reject defendant's argument. First, we note that the Supreme Court has left open the question whether the dictum of

---

3. This regulation, now superseded, provided: Corps jurisdiction would extend to all coastal waters subject to the ebb and flow of the tide shoreward to their mean high water mark ... and also to all wetlands, mudflats, swamps and similar areas which are contiguous or adjacent to coastal waters. This would include wetlands periodically inundated by saline or brackish waters that are characterized by the presence of salt water vegetation capable of growth and reproduction....

*Hepner* and *Regan* "correctly divines the intent of the Seventh Amendment," or whether the seventh amendment has no application to government litigation at all. *Atlas Roofing*, 430 U.S. at 449 n. 6, 97 S.Ct. at 1266 n. 6.

Second, even assuming that the seventh amendment applies to government litigation, the fact that the government is suing to collect statutory penalties does not require a jury trial. The Supreme Court has not gone "so far as to say that any award of monetary relief must necessarily be legal [as opposed to equitable] relief" for purposes of determining the right to a jury trial. *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974). In *Regan* (as in *Hepner*), the monetary relief sought was a penalty of a set amount, and the Supreme Court analogized the suit to "a civil action of debt." *Regan*, 232 U.S. at 47, 34 S.Ct. at 216. Here the penalties are within the district court's discretion; the government is not suing to collect a penalty analogous to a remedy at law, but is asking the district court to exercise statutorily conferred equitable power in determining the amount of the fine.

Nor are the penalties simply equivalent to punitive damages in actions at law. Here the assessment of penalties intertwines with the imposition of traditional equitable relief. The district court fashions a "package" of remedies, one part of the package affecting assessment of the others.[4] This combined relief serves several goals, including environmental preservation and fairness to third party property buyers as well as deterrence. In such circumstances, the seventh amendment is inapplicable. *See Jones & Laughlin*, 301 U.S. at 48–49, 57 S.Ct. at 629–630, *quoted in Atlas Roofing*, 430 U.S. at 453, 97 S.Ct. at 1268 (seventh amendment inapplicable where "recovery of money damages is an incident to [nonlegal] relief even though damages might have been recovered in an action at law," since equity courts historically granted such monetary relief).

## IV.

### *Whether the Government is Equitably Estopped from Suing Tull*

 Tull argues that the government is equitably estopped from obtaining relief because Corps personnel misled him into believing that his filling activities were lawful and did not require a permit. The district court emphatically rejected this argument, finding that nothing the government did or failed to do misled the defendant. We cannot say this finding was clearly erroneous, and with no showing that the government misled Tull the equitable estoppel argument certainly must fail. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, —— ——, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42, 51–52 (1984) (invoking equitable estoppel against government requires at least a showing that party reasonably relied on government's misleading conduct). We therefore need not reach the issue whether misleading by silence or inaction, the most Tull alleges here, could ever justify invoking the equitable estoppel doctrine against the government. *Cf. id.*, 467 U.S. at ——, 104 S.Ct. at 2224, 81 L.Ed.2d at 52 (whether doctrine applicable to government at all an open question); *United States v. Harvey*, 661 F.2d 767, 773–74 (9 Cir.1981), *cert. denied*, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 72 (1982) (invocation of doctrine against government requires affirmative misconduct).

Tull complains in particular about a Corps of Engineers' visit to the Ocean Breeze property in July of 1976. An engineer told him not to place fill in one part of his property; Tull claims this instruction led him to believe that filling without a permit anywhere else on his property would be proper. Yet several witnesses testified that the purpose of the Corps' visit was to determine whether *ongoing* work required filling permits. At the time

---

**4.** Thus the fine for filling Fowling Gut Extended was offered as an alternative to the injunctive remedy of restoring that waterbody to its previous condition.

of the visit, Tull did not discuss the future development of the property at issue here with the Corps engineers; indeed, he did not yet even have a development plan. Thus, there did not even exist plans that the engineers could have tacitly endorsed. Further, Tull's earlier disputes with the Corps over the filling of property meant he could not have been ignorant of the general requirement of obtaining a permit to fill wetlands.

Tull further complains that the government misled him by waiting several years before bringing this suit. The district court found that any such delay did not mislead Tull. The government sued Tull unsuccessfully in 1975, issued a cease and desist order against his filling Eel Creek in 1976, and also obtained an injunction against his filling at Mire Pond. Given such circumstances, we cannot overturn the district court's finding that Tull was in no way misled by the government's failure to bring even more lawsuits against him.[5]

## V.

### Navigability of Fowling Gut Extended

■ Tull argues that he did not violate the Rivers and Harbors Act by placing fill in Fowling Gut Extended, since no credible evidence supported the district court's finding that the waterway was navigable. We disagree. The district court had before it the testimony of an oyster inspector who testified that Fowling Gut Extended was subject to the ebb and flow of the tide. The Corps' regulations in effect at the time Tull filled the waterway defined navigable

waters to include those "subject to tidal action." 33 C.F.R. § 209.260(k)(2) (1975), superseded by 33 C.F.R. § 329.4 (1984) (includes waters "subject to the ebb and flow of the tide"). See also 33 C.F.R. § 329.8(a) (1984) ("canal or other artificial waterbody that is subject to the ebb and flow of the tide is also a navigable water of the United States"). The district court therefore did not err in finding Fowling Gut Extended navigable.

We do not think that Tull's other contentions merit discussion.

*AFFIRMED.*

WARRINER, District Judge, dissenting:

Having had unhappy experiences with the United States Corps of Engineers respecting alleged encroachment by him on wetlands and navigable waters, appellant Tull hired a lawyer and a civil engineer to review proposed filling of lowlands owned by Tull near Chincoteague. With assurance from the lawyer and the engineer that his proposals would not cause damage to wetlands or navigable waters, he then called in representatives of the Corps of Engineers and took them on a tour of the sites explaining the nature of the work he proposed. During the tour he was advised by an appropriate official of the Corps that a certain proposal could not be accomplished without damage to wetlands. This oral directive was confirmed by letter within a few days. Tull strictly adhered to this direction and to another minor direction given by an official of the Corps on the scene. He proceeded with his other plans

5. The dissent, in asserting that the government should be estopped, adopts Tull's argument that he followed the Corps' 1976 directions in placing fill on his property, while the Corps stood by and watched in silence until the government brought suit in 1981. The record establishes, however, that aerial photographs of new filling on Tull's property in the summer of 1978 revealed possible statutory violations. Corps personnel then asked for an on-site meeting "to determine if the shoreline work being done on Mr. Tull's property just south of Beebe Road could be in our regulatory jurisdiction." Tull's lawyer responded by letter that "no work is being done on the property owned by [Tull]

adjoining Fowling Gut at Chincoteague Island," and that the Corps' request for an on-site meeting was therefore denied. A Corps scientist testified that at that time the Corps had information indicating that Tull had violated the law with respect to Ocean Breeze, but that it took no action because it lacked sufficient specific data on which to base a cease and desist order. Its effort to get further information by examining the property was thwarted. Given this evidence, Tull cannot argue meritoriously that he was the victim of innocent reliance, or that following the 1976 visit he had no further word from the Corps that they had any question about the propriety of his activities.

in accordance with the advice given him by his lawyer and his civil engineer.

During the next five years while the work was in progress the Corps of Engineers kept the site under surveillance both on the ground and by aerial observation and photographs. They observed over many months plaintiff engaging in the fill activity which he had pointed out to them on the ground on the day of their visit. After plaintiff had completed his work, with no further word from the Corps of Engineers that they had any question about the propriety of his activities, and after plaintiff had sold off lots in the filled area to third parties, the Corps of Engineers in the name of the United States filed this action against Tull seeking injunctive relief and civil penalties for conducting his activities without a permit.

Tull, not the Corps, was fined $75,000. Additionally, extensive and extremely expensive site restoration was required of him. Tull appeals urging that he was mistreated by the Corps of Engineers. He points to the equitable doctrine of estoppel.

The Supreme Court has consistently left open the possibility of estoppel against the government. Though the Supreme Court found in *Montana v. Kennedy*, 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–41, 6 L.Ed.2d 313 (1961), that inaccurate but "well-meant" advice given by a consular officer fell "far short of misconduct such as might prevent the United States" from carrying forward with legal action, the door to estoppel was left ajar.

The Court found that the sort of "affirmative misconduct" adverted to but not found in *Montana*, supra, also was not present in *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973). In that case the alleged misconduct of the government was in not aggressively publicizing immigration rights created by Act of Congress and in not stationing an authorized naturalization official in the Philippines during the statutory period following World War II. Still, the legal possibility of estoppel against the government was recognized. *Id.*

A government agent who failed to respond accurately to a citizen's verbal question in a fifteen minute interview was found to have not acted with sufficient "affirmative misconduct" to estop the government. The instructions he failed to comply with were contained in a claims manual, a volume containing help and guidance but not carrying the weight of law. *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). Yet the possibility of a government agent conducting the government's business in a sufficiently prejudicial manner as to estop the government from future legal action was again left open. *Id.* at 790, 101 S.Ct. at 1471.

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), involved a provider of health care that had relied on policy determinations made by a fiscal intermediary. The health care provider, experienced with government financial programs, knew or should have known to verify with the applicable governmental department the information received. Thus the inaccuracy of the information given did not estop the government in legal action. *Id.*, 104 S.Ct., at 2223.

All of these denials of estoppel left open its possibility. The case at bar can be distinguished from each on its facts. *Schweiker* and *Montana* were both cases of brief, one-time encounters with officials who gave cryptic, verbal advice. By contrast, Mr. Tull, after extensive research by his own agents, initiated a tour and inspection of his property with the specific intent of gaining a ruling from a team of officials from the Corps of Engineers who possessed the requisite knowledge. The Corps continued to monitor the construction site for the next five years.

Mr. Tull is not in the position of Mr. Hibi. He did not ask the government to expend strenuous efforts to inform him of the law. Tull hired a lawyer and an engineer and went to the trouble of arranging an inspection to confirm his understanding of the law; and then complied with it as present-

ed to him. He did not ask his questions of an intermediary as did Community Health Services of Crawford City, Inc. He went straight to the proper governmental authority in his area.

The Supreme Court has stated that for estoppel to lie against the government the private party must at least show "the traditional elements of an estoppel." *Heckler*, 104 S.Ct. at 2224. It explicitly included reasonable reliance. *Id.* at 2223.

Summarizing the traditional notion of equitable estoppel the Ninth Circuit identified four essential elements. They are: "(1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) The latter must be ignorant of the true facts (sic.); and (4) He must rely on the former's conduct to his injury." *California State Board of Equalization v. Coast Radio Products*, 228 F.2d 520, 525 (9th Cir.1955).[1] Modifying element (4) to read "he must *reasonably* rely on the former's conduct to his injury" yields a test well within the Supreme Court's standard. *Heckler*, 104 S.Ct. at 2223, 2224.

The case at bar fits all the elements of equitable estoppel. Respecting element one, the Corps certainly knew the facts. Its agents were invited to Mr. Tull's property as work commenced, toured the property, and received a description of the intended work. Though firm drawings were not available for review, the object of the inspection as presented by Mr. Tull was to reach an understanding of the limits of the Corps' interest in the property. Certainly the actions of the inspection party in touring all the properties and not just one site reinforces this. It is undisputed that Tull did no more than he said he planned to do and that the work found by the Corps to be violative of the law was the planned work—obvious to the Corps over the course of five years' surveillance. It had

to have been obvious to the Corps many times between July 1976 when the inspection was conducted and July 1981 when the complaint was filed that Mr. Tull was engaged in the work he had explained to the Corps officials. The Corps' agents conducted follow-up inspections, wrote internal memos, and recorded work progress with aerial photography. All attests to their knowledge.

As to element two, if Mr. Tull didn't have the right to believe and rely upon the Corps officials then there simply can't be a case where element two is met. He did what could reasonably be expected to make it clear that he intended to build pursuant to his own experts' opinions unless the Corps raised some objection. The Corps did not object to the purpose of the requested inspection. Significantly, wholly consonant with Mr. Tull's stated expectations and consistent with his purpose, Corps officials forbade certain construction work. Mr. Tull fully complied with the Corps' instructions. The Corps should not be permitted to pretend that it didn't know what was intended by Mr. Tull and by the Corps officials when the inspection was requested and conducted.

The "true fact" of which Mr. Tull was ignorant was that the measures he had taken to ascertain the Corps' interest in his property were inadequate. He believed he had achieved an understanding with the appropriate officials of the Corps of Engineers. He was ignorant of, and reasonably so, the "true facts" as purported five years later by the Corps that he had only obtained a ruling on one particular piece of the whole work.

Finally, I differ with the majority and find clear error in the trial court's ruling that no action or inaction by the Corps misled Mr. Tull. I would find that he did reasonably rely on the combination of actions and inactions by the Corps. Indeed, until I read the holding in this case I would have held it would be unreasonable for Mr.

1. See also *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 fn. 4 (9th Cir.1970) and 28

Am.Jur.2d, *Estoppel and Waiver*, § 27 (1966).

Tull *not* to rely on the United States Army Corps of Engineers. Both I, and Mr. Tull, know better now. As evidenced by the outcome of the trial he certainly relied to his injury.

Were this a case between two private parties the inquiry into estoppel could end here. I think Tull would win hands down. However, as reviewed earlier, estoppel against the government is justifiably eyed warily. Justice Rehnquist wrote a concurring opinion in *Heckler,* 104 S.Ct. at 2228, to refute any "impression of hospitality towards claims of estoppel against the government" that the majority's opinion might have left. He concluded that "our cases have left open the possibility of estoppel against the government only in a rather narrow possible range of circumstances." *Id.*

I believe the circumstances of this case lie within that narrow range. The actions and nonactions of the government agents involved were so far removed from effectively carrying out their duty as to show active efforts to mislead Mr. Tull to his detriment. They were "out to get him." The record supports a suspicion of intentional malice. In possession of all the facts the Corps waited until after lots were sold, when the most harm could be done, to file suit. With full authority to do so, the Corps refused to issue a cease and desist order as their controlling regulation, carrying the weight of law, required. Fed.Reg. Vol. 40, No. 144, 25 July 1975, p. 31330, Addendum "C." The guardians of the nation's wetlands eschewed diligence for trickery.

Although typically inaction on the part of the government would not justify reliance, or bring about estoppel, the inaction consequent upon the inspection tour, the research done by Mr. Tull's agents, and the surveillance, permit Mr. Tull reasonably to conclude approval. Hence, I am not pro-posing to "punish" the Corps for mis-, mal-or nonfeasance by allowing Mr. Tull to break the law. Rather, I urge the application of estoppel on behalf of a citizen who made a reasonable and good faith effort to discover the law and how it applied to him and has been severely damaged by reasonably relying on the combination of actions and nonactions of government officials, the latter in gross neglect of duty.

The Ninth Circuit found in *Sun Il Yoo v. Immigration and Naturalization Service,* 534 F.2d 1325 (1976), "affirmative misconduct" on the part of the government sufficient to estop it in relation to an alien who had acted in good faith. The Court found no acceptable reason for a delay of ten months in processing information provided by the alien. The delay made Mr. Yoo ineligible for a visa because of a change in the law that occurred while the INS procrastinated unjustifiably on his application. Mr. Yoo was fully eligible under the law as it stood when he applied. The Ninth Circuit found that "[b]y its maneuvers ..., the INS [had] ensnared petitioner in a 'Catch 22' predicament; the Service's conduct is analogous to the entrapment of a criminal defendant and, as such, cannot be countenanced." *Id.* at 1328–29.[2]

Mr. Tull's case is even more easily a source of offended decency than Mr. Yoo's. The actions of the Army Corps of Engineers gives the appearance of lying in wait with a calculating eye for five years after first lulling him into a reasonable view that his activities were acceptable; and after he invested time, money, and effort in completing what he thought to be suitable residential lots, the Corps with a bulging portfolio of evidence descended on him. For the foregoing reasons I would apply estoppel and reverse the trial court's decision.

Turning now to the question of defendant's right to a jury trial, I disagree with

---

**2.** An Arizona district court applied the "affirmative misconduct" interpretation of *Sun Il Yoo* to a case in which a lawyer was hired by the government, a hiring freeze was put into effect, the lawyer was informed upon inquiry the freeze would not affect his position, the lawyer closed out his private practice in reliance on the assurance and was then denied the job. The district court applied estoppel against the government. *Beacom v. Equal Employment Opportunity Commission,* 500 F.Supp. 428 (D.Ariz. 1980).

the majority and find error in the trial court's denial of Mr. Tull's demand for trial by jury.

33 U.S.C. § 1319(b) authorizes the government to bring civil actions in a federal district court to obtain appropriate relief, including typical equity relief, for any violation of specified sections of the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* In addition, Section 1319(d) provides for the imposition of a fine under the denomination of a civil penalty. Under subsection (d) the trial court imposed a $75,000 civil penalty without the benefit of a jury's judgment and with this I disagree.

The Supreme Court held in *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), that the collection of $250 in punitive damages pursuant to a statutory right created by § 812 of the Civil Rights Act of 1968, 42 U.S.C. § 3612, was an action at law that implicated Seventh Amendment rights to trial by jury. The Court specifically rejected the argument that the Seventh Amendment was not applicable to new causes of action created by congressional enactment and reiterated its ruling that the Seventh Amendment applies to causes of action based on statutes. *Id.* at 193, 94 S.Ct. at 1007, citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477, 82 S.Ct. 894, 899, 8 L.Ed.2d 44 (1962). "Whatever doubt may have existed should now be dispelled. The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies." *Id.*, 415 U.S., at 194, 94 S.Ct. at 1008. Legal rights are those recognizable at law as opposed to equitable rights which are recognizable only at equity. Ballentine's Law Dictionary 720 and 411 (3d Ed. 1969).

Explaining the meaning of *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the *Curtis* court declared that *Jones v. Laughlin* gave no help to a party attempting to block a jury trial when statutory rights are at issue. "*Jones & Laughlin* merely stands for the proposition that the Seventh Amendment is generally inapplicable in administrative proceedings, when jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the NLRB's role in a statutory scheme." *Curtis*, 415 U.S., at 195, 94 S.Ct. at 1008. The Court then discusses similar reasons for rejecting Seventh Amendment rights in bankruptcy proceedings and continues "but when Congress provides for enforcement of statutory rights in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." *Id.*

Continuing, the Supreme Court found punitive damages sued for under § 812 of the Civil Rights Act of 1968 to be "legal rights." "Damage action under the statute sounds basically in tort—the statutory remedy defines a new legal duty...." *Id.* "... this cause of action is analogous to a number of tort actions recognized at common law. More important, the relief sought here—actual and punitive damages—is a traditional form of relief offered in the courts of law." *Id.* at 195-6, 94 S.Ct. at 1008-9.

As noted, and relied on, by the majority, the Court then states that all monetary relief is not legal relief. But the Court continued by "sharply" contrasting an equitable award of backpay in a Title VII case "with § 812's simple authorization of actual and punitive damages." *Id.* at 197, 94 S.Ct. at 1010. Further analyzing damages arising from statutory rights the Court reasoned, "nor is there any sense in which the award here can be viewed as requiring the defendant to disgorge funds wrongfully withheld from the plaintiff. Whatever may be the merit of the 'equitable' characterization in Title VII cases, there is surely no basis for characterizing the award of compensatory and punitive damages here as equitable relief." *Id.*

I place no stock in the difference in nomenclature between the "civil penalty" of

the present case and the "punitive damages" in *Curtis*. Both arise from a right created by statute. Both deprive defendant of money by action of court as a result of a breach of the civil law. Both are remedies typically found at a court of law. Neither can be "viewed as requiring a defendant to disgorge funds wrongfully withheld." In neither case is there a functional justification to deny a jury trial. The majority simply accepted the phrase from *Curtis* out of context, as the government invited us to do in its brief, and decided the jury question wrongly.

It should be noted that both *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909), and its follow-up, *United States v. Regan*, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914), which the majority unsuccessfully seeks to distinguish, were decisions settling a debate over whether penalties in the form of so-called civil fines transformed a civil case into a criminal one. The answer was no. Neither case purports to comment on the issue at hand; whether civil penalties may be imposed under the pseudonym of "equitable relief." Both these cases were tried before juries. The *Hepner* court, presupposing a jury, was concerned with making it clear that a judge could direct a verdict if it came out at trial that there were no facts in dispute. Explicitly restricting its decision to civil cases with undisputed testimony, the court said, "the defendant was, of course, entitled to have a jury summoned in this case, but that right was subject to the condition, fundamental in the conduct of civil actions, that the court may withdraw a case from the jury and direct a verdict according to the law if the evidence is uncontradicted and raises only a question of law." *Hepner*, 213 U.S. at 115, 29 S.Ct. at 479.

The majority observes that there was a statutory limit ($1,000) on the fine imposa-ble in *Hepner* and *Regan* and that the fine imposable against Mr. Tull was unlimited. This, the majority argues, supports a view that the defendants in *Hepner* and *Regan* were entitled to a jury while Mr. Tull was not. One would think just the opposite would be the more persuasive argument. Surely if the Seventh Amendment protects one from a civil fine of $1,000, it should be construed to protect one from a civil fine of $75,000 or an unlimited fine. Cf. 42 U.S.C. § 1995; *United States v. Martinez*, 686 F.2d 334 (5th Cir.1982); *Codispoti v. Pennsylvania*, 418 U.S. 506, 512, 94 S.Ct. 2687, 2691, 41 L.Ed.2d 912 (1974).

*Regan* and *Hepner*, then, support Mr. Tull's right to trial by jury. Language in these opinions which may appear to the contrary deals only with situations where there is no genuine dispute as to a material fact.

A trial judge's unlimited discretion in meting out fines and imprisonment to contemnors of his court has long been recognized as an essential element of his authority to maintain the order, respect, and dignity of the court. Indeed, the ability to punish for contempt is deemed essential to the maintenance of our courts as functioning tribunals.

Precedent held that the authority to punish for contempt was so essential to the maintenance of our judicial system, the bedrock of the rule of law, that trial by jury could not be permitted to interfere with the determination of punishment by the judge. *Bloom v. Illinois*, 391 U.S. 194, 208, 88 S.Ct. 1477, 1485, 20 L.Ed.2d 522 (1968). Upon reviewing the need for unfettered judicial power to maintain the dignity of the court against the contempt defendant's right to a jury, the Supreme Court in *Bloom* [3] opted for trial by jury. This up-

---

**3.** "[I]n our judgment, when serious punishment for contempt is contemplated, rejecting a demand for jury trial cannot be squared with the Constitution or justified by considerations of efficiency or the desirability of vindicating the authority of the court." "We do not deny that serious punishment must sometimes be imposed for contempt, but we reject the contention that such punishment must be imposed without the right to jury trial." "When a serious contempt is at issue, considerations of efficiency must give way to the more fundamental interest of ensuring the even-handed exercise of judicial power."
*Bloom*, 391 U.S. at 208, 209, 88 S.Ct. at 1485, 1486.

setting of precedent and the recognition of the right to a jury trial despite the serious, even fundamental, considerations to the contrary, shows the strength of our Constitution's [4] demand that the right to trial by jury be not infringed.

If in contempt proceedings the weighty considerations counseling against jury intervention are set at naught against the right to a jury trial, how much more is the strength of that right when weighed against statutory protection of wetlands. Wetlands are ecologically essential. The dignity of the courts is essential to our very freedom. Surely, if trial by jury is constitutionally demanded despite the need to maintain our court system, it is also demanded despite the need to maintain our wetlands.

The majority infers that the right to jury trial is limited by a party's ability to fit his cause into a relatively constrictive box. The majority says, "the Seventh Amendment right to a jury trial is limited to suits in the nature of an action existing at common law when the amendment was adopted." Majority Opinion at 186. While the statement is true as far as it goes, the Supreme Court has found cause to ever expand what might be included in "the nature of an action existing at common law when the amendment was adopted." In fact the Supreme Court has stated that "in the federal courts equity has acted only when legal remedies were inadequate, the expansion of legal remedies provided by [an act of Congress] and the Federal Rules [of Civil Procedure] necessarily affects the scope of equity." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509, 79 S.Ct. 948, 955, 3 L.Ed.2d 988 (1959).

It is the equity judge's discretion whose borders are limited by the right to a jury trial, and not the reverse as the majority would have it. *See generally Wright & Miller, Federal Practice & Procedure, Federal Rules of Civil Procedure*, Vol. 9,

§ 2302 (1971). ["If a new cause of action is created by Congress, and nothing is said about the mode of trial, the courts must look to the nearest historical analogy to decide whether there is a right to a jury." "[A] series of [Supreme Court] cases decided since 1959 ... recognize that there is a strong federal policy favoring trial by jury of issues of fact. This policy by itself may provide the answer in cases in which the historical test gives no clear guidance." "At a minimum the *Beacon Theatres* and *Dairy Queen* cases lend impetus toward finding a right to trial by jury in doubtful cases. It is highly probable that they do much more than this." "In its decisions since 1962 the Court has shown no inclination to retreat from this judgment that jury trial is now more widely available than it had been in the past."] [footnotes omitted.]

33 U.S.C. § 1319(b) provides for all usual equitable remedies to be available to the government because there is no good substitute for telling a polluter to cease and restore, and to do so immediately. The civil penalty of subsection (d) is another matter entirely. There simply is no justification for denying trial by jury before the imposition of a fine that could devastate a person of even moderate means and could seriously damage all but a small percentage of the citizenry of this nation. Most of us just aren't rich enough to pay a $75,000 fine without flinching. Before having such punishment inflicted our Constitution and our heritage demands that the facts be presented to a jury of our peers.

Since the remedies sought by the government were both legal and equitable, and the district court may hear both at one time, Fed.R.Civ.P. 1, 2, 18, and the findings of fact necessary to determine what civil penalties, if any, would be adjudged are the same as those to be decided for the equitable remedies sought, the case should have been heard before a jury upon the defendant's demand. *Beacon Theatres, Inc.*, 359 U.S. at 506–510, 79 S.Ct. at 954–

---

**4.** If the instant action be considered civil, the Seventh Amendment requires a jury. If, despite *Hepner,* supra, the imposition of a "civil penal-

ty" of $75,000 be considered criminal, the Sixth Amendment requires a jury.

957. Therefore, on the issue of jury trial alone, the case should be reversed and remanded for a new trial. On the issue of equitable estoppel the case should be reversed and dismissed.

I respectfully dissent.