UNITED STATES of America,
Plaintiff-Appellee,
Cross-Appellant,
and

State of Florida, Department of
Environmental Regulations,
Plaintiff-Intervenor,

v.

M.C.C. OF FLORIDA, INC., Michael's
Construction Company,
Defendants-Appellants, Cross-Appellees.

No. 84–5738.

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 13, 1985.

Thomas A. Harris, Milligan, Hooper, Harris & Barry, Chattanooga, Tenn., for defendants-appellants, cross-appellees.

Michael J. Mitchell, Asst. U.S. Atty., Paul R. Ezatoff, Jr., Asst. Atty. Gen., Dept. of Environmental Regulation, Tallahassee, Fla., Maria A. Iizuka, David C. Shilton, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff-appellee, cross-appellant.

Before HENDERSON and CLARK, Circuit Judges, and HOFFMAN *, District Judge.

WALTER E. HOFFMAN, District Judge:

The United States for the Corps of Engineers brought a civil action against M.C.C. of Florida, Inc. and Michael Construction Co.[1] for violating the River and Harbor Act of 1899, 33 U.S.C. § 401 *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The State of Florida, Department of Environmental Regulation (DER) intervened as a plaintiff, charging that M.C.C. had violated similar Florida statutes, sections 403.-161(1) and 403.031 Florida Statutes. The

---

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. M.C.C. of Florida, Inc. was a subsidiary of Michael Construction Co. A merger has since occurred and, therefore, no distinction between the two is necessary. The defendants will hereinafter be referred to simply as M.C.C.

case was tried without a jury over the objection of M.C.C. The district court found for the plaintiffs and ordered M.C.C. to pay $200,000 to the court for use in restoration projects in South Florida and $20,000 in civil penalties. M.C.C. appeals this decision and the United States has cross-appealed on the issue of the appropriateness of the remedy.

In late December, 1980, the Florida Department of Transportation (DOT) awarded the contract to M.C.C. to build a replacement bridge over Niles Channel as part of its project to restore U.S. Highway 1. Niles Channel is a navigable waterway connecting the Bay of Florida with the Atlantic Ocean. The contract called for segmental construction which entails the making of large hallow concrete segments at M.C.C.'s casting yard at Conch Key. The segments were too large to be carried over land to the construction site and therefore had to be transported by barge.

The DOT, in 1975, had prepared an environmental impact study which called for a bridge with a 15 foot clearance, but stated that it may be raised. The contract made in 1980 called for a 40 foot clearance. A negative declaration was issued which meant that the project would not adversely affect the environment. DOT was responsible for obtaining all the necessary permits. In 1978, construction permits for the Niles Channel Bridge were issued by the Corps and the DER. The application specified a conventional design which would have involved trucking the construction materials over land. The segmental construction method was not decided upon until the contract was awarded in 1980. The Corps and DER were not notified of the change.

The court found that there was damage to the bottom vegetation in two areas. Site # 1, located four miles from the bridge within the National Key Deer Refuge boundaries and Site # 2, located eight miles from the bridge within the National Key Deer Refuge and the Great White Heron National Wildlife Refuge. The permits issued by the Corps and the DER covered only areas within the DOT right-of-way.

It was during the spring of 1981 that the Corps and DER became aware of M.C.C.'s barge activities. Efforts were made to reach a solution. Failing to reach agreement, the Corps issued a Cease and Desist Order on August 7, 1981, prohibiting M.C.C.'s tugs from engaging in further dredge and fill activities in the subject areas. It was the contention of the Corps and DER that the tugs were engaged in dredging and discharging pollution into the waters when the propellers of the tugs cut into the bottom, uprooting and destroying the sea grass and depositing bottom sediment on adjacent sea grass beds.

On October 7, 1981, DER and Corps personnel stopped one of M.C.C.'s tugs in the subject area and gave a copy of the Cease and Desist Order to the captain. The United States sought a temporary restraining order and on November 29, 1981, the district court held a hearing.

The district court refused to issue a restraining order but instructed the defendants to confine their tugboat trips to high tide and to alert Corps personnel of the time of their movements throughout the subject areas. The United States moved for a rehearing on the preliminary injunction which was denied. After the hearing on the temporary restraining order, M.C.C. restricted the use of its larger tug and made some efforts to comply with the court's instructions limiting its tugboat activities. M.C.C., however, did not comply fully with the court's instructions. Its tugs made at least 112 movements through Niles Channel in connection with its construction work. Many of these movements were at night or in the poor lighting conditions of dawn or dusk.

The court found that there was extensive damage to the bottom vegetation at the two sites which had been caused by M.C.C.[2] The court stated that the "damage to the

---

**2.** The court found that there was insufficient evidence to establish that M.C.C. had engaged in any dredge or fill activities in a third site.

marine vegetation and the bottom sediments in Site #1 is devestating [sic]. Acres formerly lush with vegetation have been completely denuded. The bottom scarring at Site #2, although less severe, is still extensive and significant." The court also found that other unknown people had caused some of the damage. It held, however, that since the majority of the damage had been caused by M.C.C., it would not be unjust to hold M.C.C. responsible for all the damage.

The district court held that M.C.C. had violated the River and Harbor Act by dredging with its propeller system without a permit and had discharged pollutants in violation of the Clean Water Act by redepositing bottom sediment on adjacent sea grass beds. The court also held that M.C.C. had violated the similar Florida statutes.

The United States submitted two alternative plans for restoration of the damaged areas. The United States' preferred plan would have cost $793,414 and its alternative plan would have cost $742,063. M.C.C. did not submit any plan of its own. The district court rejected both of the government's plans because their chances of success were very speculative and their costs were so high.

On appeal, we are faced with the questions of whether M.C.C.'s conduct was prohibited by the River and Harbor Act or the Clean Water Act. Also, we are asked to decide whether M.C.C. was entitled to a jury trial and whether the district court's remedy was appropriate.

**River and Harbor Act**

■ M.C.C. was found to have violated Section 10 of the River and Harbor Act. 33 U.S.C. § 403. This section provides:

**§ 403. Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in**

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless *the work* has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. (Emphasis added).

M.C.C. argues that the term "work" means a planned intentional construction or undertaking. It contends that the dredging and filling caused by the propellers of its tugs was not "work" since it did not specifically intend to dredge a channel and fill the adjacent areas. Therefore, M.C.C. argues, it did not violate the Act.

The Supreme Court discussed this section in *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1980), and rejected the narrow interpretation of Section 10 which M.C.C. urges. The Court stated that the "philosophy of the statement of Mr. Justice Holmes in *New Jersey v. New York*, 283 U.S. 336, 342 [51 S.Ct. 478, 479, 75 L.Ed. 1104 (1931)], that 'A river is more than an amenity, it is a treasure,' forbids a narrow, cramped reading either of § 13 or § 10." *Id.* at 491, 80 S.Ct. at 890.

In *Republic Steel*, the defendant was discharging solid industrial waste into a river. This progressively decreased the depth of the river. The court held that this activity violated the first clause of Section 10 which prohibits "any obstruction" not approved by Congress. In so holding, the court stated:

The reach of § 10 seems plain. Certain types of structures, enumerated in the second clause, may not be erected "in" any navigable river without approval by

the Secretary of the Army. Nor may excavations or fills, described in the third clause, that alter or modify "the course, location, condition, or capacity of" a navigable river be made unless "the work" has been approved by the Secretary of the Army. There is, apart from these particularized invasions of navigable rivers, which the Secretary of the Army may approve, the generalized first clause which prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity" of such rivers. We can only conclude that Congress planned to ban any type of "obstruction," not merely those specifically made subject to approval by the Secretary of the Army.

*Id.* at 486–7, 80 S.Ct. at 887.

Later, in *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), the Court again emphasized the breadth of the language used by Congress. It stated that the River and Harbor Act of 1899 "was obviously intended to prevent obstructions in the Nation's waterways. Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad." *Id.* at 201, 88 S.Ct. at 385. Clearly, the Supreme Court has rejected the narrow interpretation of Section 10 which M.C.C. has advocated. Congress has prohibited all activities which obstruct the navigable waters of the United States, not just those that fall within the third clause of Section 10.

But, even if we accept M.C.C.'s interpretation of Section 10, M.C.C.'s activities clearly fit within those that require a permit under the third clause of the section. The district court found that M.C.C. "willfully violated" the Act and described their behavior as "illegal and willful." Furthermore, the district court specifically found that M.C.C. "knowingly created the propeller-dredged channel." We can not say that the district court erred in its assessment of M.C.C.'s conduct.

M.C.C. made over 112 trips through the area with its tugs after it was served with a cease and desist order by the Corps.

Also, M.C.C. failed to fully comply with the district court's instruction limiting the activities of its tugs. Repeatedly going back and forth across the subject areas with equipment that is dredging a channel and dumping the spoil on the adjacent sea grass beds clearly fits within the plain language of the third clause of Section 10. The fact that the equipment used was the propellers of a tug is immaterial. M.C.C. knew that its activities were dredging a channel and filling the adjacent areas. It did not comply with the district court's instructions which were designed to avoid, or at least limit, the damages. Although M.C.C.'s ultimate goal was to construct a bridge for U.S. 1, as part of that work, it willfully and with full knowledge, dredged and filled in the subject areas.

**Clean Water Act**

■ The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, prohibits, with certain exceptions not applicable in this case, the discharge of pollutants into the navigable waters of the United States. The term, "discharge of a pollutant" is defined as "(A) any addition of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12). A "point source" is defined as:

any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or *vessel or other floating craft*, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture."

33 U.S.C. § 1362(14) (emphasis added). The Act defines "pollutant" to mean:

*dredged spoil*, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, *biological materials*, radioactive materials, heat, wrecked or discarded equipment, *rock, sand*, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6) (emphasis added).

■ Clearly, the tugs used by M.C.C. were point sources since the Act specifical-

ly includes vessels within the meaning of that term. Furthermore, the vegetation and sediment that was redeposited on the adjacent sea grass bed was a "pollutant" since the Act includes "dredged spoil" in the definition of that term. The question presented to this court, therefore, is whether the redepositing of the spoil dredged by the propellers of M.C.C.'s tugs constituted a "discharge of a pollutant," within the meaning of the Act. M.C.C. contends that since the definition of "discharge of a pollutant" uses the word "addition," that the redepositing did not add anything to the waters of the United States and therefore it did not violate the Clean Water Act. We, however, conclude that M.C.C. did violate the Act by redepositing the vegetation and sediment on the adjacent sea grass beds.

Congress declared that the objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The House Committee on Public Works, in a report which accompanied the House bill, stated:

> Subsection (a) of section 101 declares the objective of this legislation to be the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.
>
> The word "integrity" as used is intended to convey a concept that refers to a condition in which the natural structure and function of ecosystems is maintained.
>
> \* \* \* \* \* \*
>
> Although man is a "part of nature" and a production of evolution, "natural" is generally defined as that condition in existence before the activities of man invoked perturbation which prevented the system from returning to its original state of equilibrium.
>
> This definition is in no way intended to exclude man as a species from the natural order of things, but in this technological age, and in numerous cases that occurred before industrialization man has exceeded nature's homeostatic ability to respond to change. Any change induced by man which overtaxes the ability of nature to restore conditions to "natural"

or "original" is an unacceptable perturbation.

H.Rep. No. 92–911, 92d Cong., 2d Sess. 76–77 (1972), reprinted in 1 Legislative History 753, 763–764 (quoted in *Minnehaha Creek Watershed District v. Hoffman*, 597 F.2d 617, 625 (8th Cir.1979).

Given the broad objectives of the Clean Water Act, we are in agreement with the Fifth Circuit that the "word 'addition' as used in the definition of the term 'discharge,' may reasonably be understood to include 'redeposit.'" *Avoyelles Sportsmen's League Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983). The redepositing of spoil dredged up by the tug's propellers onto the adjacent sea grass beds clearly disturbs the "physical and biological integrity" of the subject areas. The damage done to these areas was too severe for nature to be able to restore them to their natural condition herself. Therefore, we affirm the district court's decision that M.C.C. violated the Clean Water Act.

**Jury Trial**

 M.C.C. contends that it was entitled to a jury trial and that the district court therefore erred in striking its demand for one. The Seventh Amendment to the Constitution provides that in "Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. Amend. VII. The Supreme Court has held that it is "the nature of the issue to be tried rather than the character of the overall action" that is determinative. *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970). When there are both legal and equitable issues present, then the right to a jury trial as to the legal issues remains. *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Therefore, we must examine whether any of the issues were legal in nature.

The Supreme Court in *Williamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1877), held that there was no common law of the United States

which prohibited obstructions in navigable rivers. *Id.* at 8, 8 S.Ct. at 814. The River and Harbor Act of 1899 was passed by Congress to rectify this problem. *United States v. Republic Steel Corp.*, 362 U.S. 482, 486, 80 S.Ct. 884, 887, 4 L.Ed.2d 903 (1960). Later, in *Wyandotte Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), the Court held that the government could bring suit to recover the cost of removing a sunken vessel even though the Act did not specifically provide for it. The analysis used by the court was equitable in nature.

The Supreme Court has also used an equitable analysis in interpreting the Clean Water Act. Recently, in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Court stated that the Clean Water Act permitted "the exercise of a court's equitable discretion, whether the source of pollution is a private party or a federal agency, to order relief that will achieve *compliance* with the Act." *Id.* at 318, 102 S.Ct. at 1806 (emphasis added). It is clear that both the Clean Water Act and the River and Harbor Act issues were equitable in nature. Therefore, M.C.C. was not entitled to a jury trial.[3]

**Remedy**

█ The district court rejected the government's two alternative restoration plans because it determined that their prospect for success was too speculative and that they were too costly. In *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir.1976),[4] the Fifth Circuit

stated that the "degree and kind of wrong and the practicality of the remedy must be considered in the formulation of that remedy." *Id.* at 1301. In the case at bar, that is precisely what the district court did in rejecting the government's plan. Instead, the district court required M.C.C. to pay to the court $200,000 to be used in restoration of areas in South Florida, and a $20,000 fine.

We concur with the district court's findings and conclusion that the government's two alternative restoration plans were too speculative and costly. We cannot concur in the requirement that M.C.C. pay to the court $200,000 to be used in restoration areas in South Florida without any specific plan having been suggested or submitted. We concur in the district court's conclusion that where on-site restoration cannot be feasibly accomplished, mitigation is an appropriate remedy. We note the district court's adoption of the remedy in *United States v. Board of Trustees of Florida Keys Community College*, 531 F.Supp. 267 (S.D.Fla.1981). In that case the court similarly concluded that restoration of the destroyed site was too expensive and was infeasible, and required the defendant to provide an alternative beneficial environmental area comparable to the destroyed area and one that would serve the same purpose. We concur in the district court ordering such a remedy but remand for the purpose of the court requiring the defendant to prepare and submit a substitute environmental plan together with estimated costs. The parties should have ample op-

---

**3.** Our attention is directed to *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985). In a financing agreement between K.M.C. and Irving, a paragraph stated that each party "waives all right to a trial by jury in any action or proceedings relating to transactions under this Agreement." The opinion discusses the necessity of a waiver being "knowing and voluntary." It is clearly inapposite. On the other hand the recent case of *United States v. Tull*, 769 F.2d 182 (4th Cir.1985), is squarely in point in that the action was brought under the River and Harbor Act, 33 U.S.C. § 401, *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, the same as in the instant case. We incorporate the reasoning of Chief Judge Winter in *Tull* as further

authority for our conclusion on the jury trial issue.

**4.** On August 26, 1985, appellants filed a motion to supplement the record, a suggestion of mootness, and a motion to vacate. These matters, while appearing to be newly discovered, may, or may not, affect the remedy which we have remanded to the district court. In permitting further evidence to be submitted, we suggest that the issues raised by this post-argument motion should be explored. We do not intimate in any manner what the final result should be; nor do we make any finding that the damages previously determined by the district court are in any way affected by the issues raised by appellants in their post-argument motions.

portunity to confer with one another about such an alternative remedy. The district court should retain jurisdiction to assess the costs of such a remedy and to insure its implementation by giving court approval to the plan and the methodology to be used and the parties responsible for performing the alternative appropriate environmental remedy.[5]

The government asserts that the district court abused its discretion in refusing to order M.C.C. to restore areas of the Niles Channel. We agree with the district court and, additionally, we should note that, as to certain areas of the Niles Channel, the recent developments mentioned in footnote 4 may be included therein.

For the reasons stated in the foregoing opinion this case is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

---

5. The decisions of the Fifth Circuit prior to September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).