729 F.2d 391
 20 ERC 2124, 21 ERC 1528, 14 Envtl.
L. Rep. 20,365,
14 Envtl. L. Rep. 20,617
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
RIVERSIDE BAYVIEW HOMES, INC., a Michigan corporation, and
Allied Aggregate Transportation Company, a
Michigan corporation,
Defendants-Appellants, Cross- Appellees.
 Nos. 81-1405, 81-1498.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 5, 1983.
Decided March 7, 1984.
Opinion on Denial of Rehearing and Rehearing En Banc June 8, 1984.
 
 Richard R. Gienapp, argued, Detroit, Mich., for defendants-appellants, cross-appellees.
 Richard A. Rossman, U.S. Atty., Detroit, Mich., Hayward L. Draper, Asst. U.S. Atty., Detroit, Mich., Thomas H. Pacheco, Anne S. Almy, U.S. Dept. of Justice, Land & Nat. Resources Div., Washington, D.C., Ellen J. Durkee, argued, Melvyn B. Kalt, Deputy Dist. Counsel, U.S. Army Corps of Engineers, Detroit, Mich., for plaintiff-appellee, cross-appellant.
 Before MERRITT and MARTIN, Circuit Judges, and WEICK, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 This is an environmental case concerning "wetlands" and the jurisdiction of the United States Army Corps of Engineers over them. The government claims that defendants, Riverside Bayview Homes, Inc., and Allied Aggregate Transportation Company, violated section 301(a) of the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1311(a) (1976), and regulations concerning "wetlands" purportedly issued under that Act. The claimed violation occurred when the defendants deposited fill material on Riverside's land, which the government asserts is a "wetland," without obtaining a permit from the Corps of Engineers as required by the Act. Judge Cornelia Kennedy, sitting as a District Judge, issued a permanent injunction prohibiting further filling on a large portion of Riverside's property and a declaratory judgment holding one of the Corps regulations unconstitutional. Both parties then appealed.
 
 
 2
 On the first appeal, 615 F.2d 1363 (6th Cir.1980), this Court remanded the case for further proceedings in the District Court in light of a new regulation promulgated by the Corps. That regulation, found at 33 C.F.R. Sec. 323.2(c) (1983), specifically altered the definition of "wetlands" relied upon by Judge Kennedy in the original District Court proceeding. We conclude that the District Court on remand erred in interpreting the new definition of wetlands to include defendant's property and in continuing the permanent injunction under the new regulation. We also vacate as moot the declaratory judgment issued by the District Court in the first proceeding.
 
 I. THE LAND IN QUESTION
 
 3
 Riverside owns approximately eighty acres of undeveloped land north of Detroit in Harrison Township, Michigan, which it had planned to develop for housing. It is located in a suburban area approximately a mile west of Lake St. Clair and south of South River Road, roughly paralleling the Clinton River. Its southern boundary is separated from the man-made Savan Drain by two ten-acre parcels. Its western boundary is formed by Jefferson Avenue, a heavily travelled road.[1]
 
 
 4
 Riverside's property comprises one sixty-acre parcel and a partially adjoining twenty-acre parcel. The sixty acres running along Jefferson Avenue were actively farmed in the past. In 1916, the sixty-acre tract was platted as a subdivision, and storm drains and fire hydrants were installed. The remaining twenty-acre parcel was neither platted nor improved. In the early and mid-1950's, some efforts were made by the owner to develop the platted subdivision. In 1960, the newly-formed Riverside Corporation bought the property. According to Riverside, its efforts to develop the property along with the surrounding area during the 1960's were stymied by an adjacent property owner who blocked an effort to reroute a street dissecting the property, and by a local zoning ordinance which forced it to fill the property to a specific elevation.
 
 
 5
 In 1973, unprecedented high water levels on the Great Lakes, including Lake St. Clair, located a mile east of the Riverside land, prompted emergency action by Harrison Township and the Corps of Engineers to protect area homes and businesses from water damage. Emergency measures included building a semicircular dike which dissected the twenty-acre parcel and extended southeast across the sixty-acre tract, and filling a ditch along Jefferson Avenue with dirt, thereby destroying the drainage on the western border of the property.
 
 
 6
 In furtherance of its development plans, Riverside contracted with Allied Aggregate Transportation Company in the fall of 1976 to have dirt fill hauled to the property. It was unclear whether or not the land would be subject to the Corps' regulatory jurisdiction. Accordingly, a Riverside stockholder met with Corps personnel to discuss whether a permit must be obtained in order to proceed with filling the land. Riverside submitted an incomplete application for a permit in November, 1976.
 
 
 7
 Before the permit application had been acted on by the Corps, Riverside began placing fill on the property north of the dike. On December 22, 1976, Riverside was ordered by the Corps to cease and desist from further filling. When Riverside continued to fill, the Corps asked the United States Attorney to bring this enforcement proceeding.
 
 
 8
 On January 7, 1977, the District Court entered a temporary restraining order prohibiting Riverside and Allied from engaging in further filling, pending a full evidentiary hearing. After that hearing, which encompassed seven days of testimony, Judge Kennedy issued an opinion granting the government's motion for a preliminary injunction. Judge Kennedy also held unconstitutional a Corps regulation requiring the processing of an application for a permit to be postponed once the United States Attorney has begun enforcement proceedings. On June 20, 1979, the District Judge issued the court's final judgment holding a large portion of Riverside's land to be a wetland subject to Corps regulation under the Federal Water Pollution Control Act. Judge Kennedy permanently enjoined further filling on that portion of the property until the Corps issues a permit to Riverside. At the same time, she issued an order holding defendants in contempt of court because they had continued to fill the property. The defendants were ordered to remove the fill, which they have apparently done. Since that time, Riverside's application for a Corps permit has been processed and denied.
 
 II. THE WETLANDS DETERMINATION
 A. Statutory and Regulatory Background
 
 9
 The Federal Water Pollution Control Act was enacted to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. Sec. 1251(a) (1976). The Act declares that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." Id. Sec. 1251(a)(1). Section 301 of the Act states that, except as permitted under certain exceptions, "the discharge of any pollutant by any person shall be unlawful." Id. Sec. 1311(a). One of the express exceptions to this rule is contained in section 404, 33 U.S.C. Sec. 1344, which authorizes the Corps to issue permits for the disposal of dredged or fill materials into "navigable waters."
 
 
 10
 The Act contemplates that applications for section 404 permits are to be evaluated by the Corps under regulations developed jointly by the Environmental Protection Agency and the Corps. See id. Sec. 1344(b); 40 C.F.R. Sec. 230 (1983). These regulations are supposed to identify the factors to be used in determining whether filling will have an adverse impact on water quality. A person who fills or otherwise discharges pollutants into "navigable waters" without a permit subjects himself to civil or criminal penalties. See 33 U.S.C. Sec. 1344(h)(1)(G) (violations of permit program entail "civil and criminal penalties and other ways and means of enforcement").
 
 
 11
 The "navigable waters" which the Federal Water Pollution Control Act was meant to protect are defined in the Act as "the waters of the United States, including the Territorial seas."[2] Id. Sec. 1362(7). The Act does not mention or define "wetlands." The Corps and the EPA, however, developed regulations pursuant to the Act covering areas denominated as "wetlands" as well as the congressionally specified "navigable waters." These regulations, including the permit procedures noted above, seek to prohibit tampering with wetlands without the express permission of the agencies.
 
 B. The Wetlands Definition
 
 12
 At the time that this action was initially brought, the Corps regulation defined wetlands and provided that a permit must be obtained for filling of
 
 
 13
 Freshwater wetlands including marshes, shallows, swamps and similar areas that are contiguous or adjacent to other [sic] navigable waters and that support freshwater vegetation. "Freshwater wetlands" means those areas that are periodically inundated and that are normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction.
 
 
 14
 33 C.F.R. Sec. 209.120(d)(2)(i)(h) (1976) (emphasis added).
 
 
 15
 The question before the District Court in the initial proceeding was whether the Riverside land possessed the characteristics set forth in the above definition and thus should be classified as a wetland subject to the Corps' regulatory jurisdiction. Judge Kennedy found that the land was contiguous to a navigable water, Black Creek, which is a tributary of Lake St. Clair. Furthermore, she found that because of the type of soil found on the land, the unfilled Riverside property was "characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction." These two aspects of the wetlands definition having been satisfied, the District Court focused on the question of whether the land was "periodically inundated."
 
 
 16
 Judge Kennedy's resolution of this issue was based on what she admitted was an unavoidably "arbitrary" interpretation of the term "periodic" as it is used in the Corps regulation. She accepted the standard dictionary definition, "flooded," as the meaning of "inundated," but was compelled to rely on a rough statistical plotting of the potential for flooding of the Riverside land in order to determine whether it was "periodically inundated," or flooded on a "periodic" basis.
 
 
 17
 Judge Kennedy found that the Riverside land was rarely if ever inundated. From testimony concerning Lake St. Clair which established that a water level of 575.0 feet would be reached or surpassed only about two percent of the time, she concluded that it was difficult to ascertain whether the Riverside land south and east of the contour line of 575.5 feet was ever flooded. She explained:
 
 
 18
 The mean of the elevations on the south and east of defendants' property is 574.6, ranging from 575.70 to 574.45. Using the monthly mean level of Lake St. Clair ... and adding six inches, the normal variation, it is immediately apparent that there have been long periods of time when none of the property was inundated by water from contiguous or adjacent navigable waters. Indeed, this has been true most of the time.
 
 
 19
 Opinion and Order Granting Motion for Preliminary Injunction in Part at 6 (emphasis added). Judge Kennedy noted that the high-water levels in the period from 1973-75 were unprecedented. From this and other statistical information, she extrapolated that "there have been periods in only 14 of the 80 years of recorded lake levels in which the monthly mean inundated the property,--or, 17% of the time," and that "[s]ome of the higher elevations have been inundated only during the last recent unprecedented high water or have never been inundated." Id. (emphasis added).
 
 
 20
 Despite these misgivings, Judge Kennedy found that there was sufficient evidence from which to conclude that the land had been "inundated." Accordingly, she then turned to the question of whether that inundation was "periodic," observing that "[t]he Court is left in the unenviable position of having to define 'periodic' without knowing the reason for the adoption of this standard." Id. at 7. She found that the Riverside land at the contour line of 575.5 feet above sea level had been inundated on four to six occasions in the past eighty years. Acknowledging that there was no precedent for her analysis, Judge Kennedy reasoned:
 
 
 21
 If treating the years 1972-1975 and 1952-1953, as one occurrence, then the lake levels have exceeded 575 feet only four times (1928, 1952-1953, 1969 and 1972-1975). If the level of 574.9 feet were to be considered, the number of occurrences would increase to six ... [I]t is clear that determining the level at which the inundation would be considered "periodic" is difficult and perhaps somewhat arbitrary. The Court must choose the point at which an occurrence became periodic. It has selected more than five. It therefore determines that the appropriate level is 575 feet, plus the half-foot of normal monthly fluctuation [of the mean high water level of Lake St. Clair] above the mean.
 
 
 22
 Id. On this basis, the District Court enjoined Riverside from placing fill below the 575.5 foot contour line without first obtaining a Corps permit. Under this ruling, some eighty percent of the land was denominated as a "wetland," and therefore was not usable as contemplated by the landowner without the government's permission.
 
 
 23
 In 1977, after Judge Kennedy's initial permanent injunction was issued, the Corps wetlands definition on which the ruling was based was repealed and replaced. Wetlands are now defined as
 
 
 24
 those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.
 
 
 25
 33 C.F.R. Sec. 323.2(c) (1983).
 
 
 26
 In the preamble to the new regulations, the Corps explained that the wetlands definition had been changed "to eliminate several problems and achieve certain results." The reference to "periodic inundation" was deleted because
 
 
 27
 [m]any interpreted that term as requiring inundation over a record period of years. Section 404 is intended to regulate discharges of dredged or fill material into the acquatic system as it exists, and not as it may have existed over a record period of time.
 
 
 28
 42 Fed.Reg. 37128 (July 19, 1977) (emphasis added). The preamble goes on to indicate that the new definition "pertains to an existing wetland and requires that the area be inundated or saturated by water at a frequency and duration sufficient to support aquatic vegetation." Id.
 
 
 29
 For similar reasons, the Corps also eliminated the term "normally" in the wetlands definition, replacing it with the phrase, "and that under normal circumstances do support." The preamble notes that the term "normally" was used in the original version of the definition "to respond to those situations in which an individual would attempt to eliminate the permit review requirement of Section 404 by destroying the aquatic vegetation, and to those areas that are not aquatic but experience an abnormal presence of aquatic vegetation." Id. (emphasis added). Significantly, the preamble notes that it is still the case under the new regulation that "[t]he abnormal presence of aquatic vegetation in a non-acquatic area would not be sufficient to include that area within the Section 404 program." Id.
 
 
 30
 III. APPLICATION OF WETLANDS REGULATIONS TO FACTS
 
 
 31
 The changes in the Corps wetlands definition meant that the task before Judge Gilmore was essentially that of applying this new definition to the facts as found by Judge Kennedy in the earlier proceeding to determine whether the Riverside property below the elevation of 575.5 feet above sea level is or is not a wetland. Our order remanding this case to the District Court for further examination in light of the new regulation did not make the nature of the inquiry clear, however. We did not point out to Judge Gilmore precisely what we expected him to do.
 
 
 32
 We should have directed the District Court to consider the voluminous evidence from the seven days of testimony given earlier and to make a finding as to whether the Riverside property to the south and east of the contour line of an elevation of 575.5 feet, as it exists now, should be classified as a wetland. Instead, in the absence of clear directions, the District Judge on remand simply found from a common-sense reading of the new language that the amended regulation was "broader than its predecessor." Presumably, his reasoning from there was that, since Judge Kennedy had found that the property was "periodically inundated," and since it does support some aquatic vegetation, it must therefore be inundated "at a frequency and duration sufficient to support, and that under normal circumstances [does] support" wetlands vegetation.
 
 
 33
 It does not necessarily follow, however, that because an area has been flooded five times in more than eighty years that, "as it exists" now, it is "inundated at a frequency and duration sufficient to support and that under normal circumstances [does] support" wetlands vegetation. The new regulation makes clear that it is the present occurrence of inundation or flooding sufficient to support wetlands vegetation, not the mere presence of such vegetation from some other cause, that determines whether a particular area is a wetland. Thus, as we understand it, the presence of inundation on the land "as it exists" now, sufficient to cause the growth of aquatic vegetation, is necessary to satisfy the wetlands definition. Neither inundation nor aquatic vegetation would be sufficient, standing alone, to bring a piece of land within the definition. Both must be present, and the latter must be caused by the former.
 
 
 34
 Were this not so, then areas which inexplicably support some species of aquatic vegetation, but which are not normally inundated, would fall within the wetlands definition. Such a perverse result could not have been what the Corps contemplated in promulgating the regulation. Indeed, as noted earlier, the Corps expressly adverted to the situation of "areas that are not aquatic but experience an abnormal presence of aquatic vegetation" and emphasized that such lands were not intended to be covered by the regulations.
 
 
 35
 Turning now to the facts as found by Judge Kennedy, and applying our interpretation of the new wetlands definition to those facts, we conclude that the Riverside land is not a wetland. We note at the outset that Judge Kennedy did not find that the land, "as it exists" now, is inundated. Nor is there evidence in the record to support such a finding. After examining the evidence, Judge Kennedy found that the land had only been flooded on four to six occasions in the eighty years of recorded history of the area. Although flooding of such infrequency might properly be called "periodic," it cannot fairly be said that it describes the land "as it exists."
 
 
 36
 Judge Kennedy did find that, quoting from the old regulation, the Riverside land was characterized "by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction." Significantly, however, she found that the source of this vegetation was the type of soil found on the property and not the few instances of flooding. The evidence supports her determination that the infrequent inundation caused by the adjacent navigable water, Black Creek, was not the cause of the wetland vegetation. Thus she did not find, and on the evidence presented could not have found, that the land, as it exists now, is "inundated at a frequency and duration sufficient to support, and that under normal circumstances [does] support" the wetlands vegetation. Nor did she consider or make any findings concerning the question whether the Riverside land fits the Corps definition of an area which is technically not a wetland, because it is not inundated, but which experiences an abnormal presence of aquatic vegetation.[3]
 
 
 37
 In the absence of evidence that the property as it exists now is frequently flooded and that the flooding causes aquatic vegetation to grow there, the government's case is insufficient to justify a classification of this property as a wetland subject to the jurisdiction of the Corps of Engineers. The injunction is therefore vacated.
 
 
 38
 IV. NARROW INTERPRETATION OF "WETLANDS" REGULATION NECESSARY
 
 
 39
 In deciding that the District Court erred on remand in failing properly to assess the impact of the new wetlands definition upon Judge Kennedy's earlier wetlands determination, we construe the regulation containing the definition somewhat narrowly in order to avoid serious questions concerning the validity of the definition itself under the Act. In delegating authority to the Corps under the Federal Water Pollution Control Act, Congress defined the subject matter intended to be protected by the statute as the "navigable waters." Section 502(7) defines "navigable waters" as "waters of the United States including the Territorial seas." The language of the statute makes no reference to "lands" or "wetlands" or flooded areas at all.
 
 
 40
 Congress may, indeed, have meant to extend the protections of the Act beyond the straightforward definition it provided of "navigable waters."[4] The question, however, is how far away from "navigable waters" Congress contemplated that the regulations under the Act could drift. It is certainly not clear from the statute that the Corps' jurisdiction goes beyond navigable waters and perhaps the bays, swamps and marshes into which those navigable waters flow. Neither is it clear that Congress intended to subject to the permit requirement inland property which is rarely if ever flooded. Nor is it clear that the statute was intended to cover a piece of property a mile inland from Lake St. Clair which has been farmed in the past and is now platted and laid out for subdivision development with the fire hydrants and storm sewers already installed.
 
 
 41
 To prohibit any development or change of such property by the landowner raises a serious taking problem under the fifth amendment. It is well established that government regulation can effect a fifth amendment taking. The rationale, as stated by Justice Brennan, is that "[p]olice power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). Recently, in Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court addressed a problem markedly similar to this one and declared:
 
 
 42
 Although the Government is clearly correct in maintaining that the now dredged Kuapa Pond falls within the definition of "navigable waters" as this Court has used that term in delimiting the boundaries of Congress' regulatory authority under the Commerce Clause, ... this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation.
 
 
 43
 Id. at 172, 100 S.Ct. at 388 (citations omitted). In Kaiser Aetna, the Supreme Court found that the government's attempt to create a public right of access to a pond which was improved so as to be capable of supporting navigation but had always been considered private property "goes so far beyond ordinary regulation or improvement for navigation as to amount to a taking ...." Id. at 178, 100 S.Ct. at 392 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). The Court found the Kaiser Aetna petitioners' interest in their dredged marina-style subdivision community which included Kuapa Pond "strikingly similar" to that of owners of fast land adjacent to navigable water, like Riverside, noting that there was no doubt that "when the Government wishe[s] to acquire fast lands, it [is] required by the Eminent Domain clause of the Fifth Amendment to condemn and pay fair value for that interest." Id. at 177, 100 S.Ct. at 391. The Court concluded:
 
 
 44
 [I]f the Government wishes to make what was formerly Kuapa Pond into a public aquatic park after petitioners have proceeded as far as they have [in developing it as a private subdivision] it may not, without invoking its eminent domain power and paying just compensation, require them to allow free access to the dredged pond while petitioners' agreement with their customers calls for an annual $72 regular fee.
 
 
 45
 Id. at 180, 100 S.Ct. at 393.
 
 
 46
 The parallels between Kaiser Aetna and this case are obvious and hardly require elaboration. We note only that we see a very real taking problem with the exercise of such apparently unbounded jurisdiction by the Corps, a problem we avoid by construing the regulation containing the amended wetlands definition as limited to lands such as swamps, marshes, and bogs that are so frequently flooded by waters from adjacent streams and seas subject to the jurisdiction of the Corps that it is not unreasonable to classify them as lands which frequently underlie the "waters of the United States." See 2A SUTHERLAND ON STATUTORY CONSTRUCTION Sec. 45.11, at 33-34 (C. Sands ed. 1973) (discussing presumption of constitutionality of statutes).
 
 
 47
 Accordingly, we interpret the words "inundated at a frequency and duration sufficient to support, and that under normal circumstances [does] support [wetlands vegetation]" as set forth in the amended regulation to require frequent flooding by waters flowing from "navigable waters" as defined in the Act. The definition thus covers marshes, swamps, and bogs directly created by such waters, but not inland low-lying areas such as the one in question here that sometimes become saturated with water.
 
 V. THE DECLARATORY JUDGMENT
 
 48
 During the two and one-half years of litigation of the issue of the Corps' jurisdiction over Riverside's property, the Corps declined to process an application for a permit to fill the area in question. The agency was precluded by regulation from acting on Riverside's application because the United States Attorney had initiated enforcement proceedings after it was discovered that Riverside was engaged in unauthorized filling. The Corps regulation provides:
 
 
 49
 If the District Engineer refers a case to the local U.S. Attorney or if criminal and/or civil action is instituted against the responsible person for any unauthorized activity, the District Engineer shall not accept for processing any application for a Department of the Army permit until final disposition of the referral action and/or all judicial proceedings, including the payment of all prescribed penalties and fines and/or completion of all work ordered by the court. Thereafter, the District Engineer may accept an application for a permit; provided, that with respect to any judicial order requiring partial or total restoration of an area, the District Engineer, if so ordered by the court, shall supervise this restoration effort and may allow the responsible persons to apply for a permit for only that portion of the unauthorized activity for which restoration has not been so ordered.
 
 
 50
 33 C.F.R. Sec. 326.4(e) (1982) (current version as amended at 33 C.F.R. Sec. 326.3(c)(3) & n. 2 (1983)).
 
 
 51
 Riverside asked the District Court in the initial enforcement proceeding to issue a declaratory judgment declaring this regulation to be unconstitutional as a de facto taking of Riverside's property. In a memorandum opinion, Judge Kennedy held that the postponement of processing of Riverside's application for a permit under the regulation "effect[s] a quasi-taking of property unless and until a person relinquishes any right the person may have to engage in litigation with the Corps of Engineers." Opinion of the Court at 9. Moreover, Judge Kennedy held that the deferral was a sanction unauthorized by the section of the Federal Water Pollution Control Act which gives the Corps the authority to promulgate regulations to carry out its functions. Id.
 
 
 52
 Judge Kennedy interpreted the regulation as denying defendant "the right to litigate the constitutionality of a statute or regulation on peril of losing its rights to pursue its administrative adjudication remedies." See id. Apparently, she understood the regulation to compel the defendant to choose between litigating his claim that the regulation effects an unconstitutional taking of his property, and proceeding with his application for an after-the-fact permit which, if granted, would enable him to continue with his development project.
 
 
 53
 Riverside's opposition to the regulation postponing the permit process cannot alter the fact that nothing in the regulation now adversely affects its interests. We construed the Corps wetlands definition narrowly and concluded that Riverside's property is not a wetland and that, therefore, the Corps has no jurisdiction over it. Riverside is now free to develop its land as it wishes. Moreover, the challenged regulation has since been amended to suggest a strong presumption in favor of processing applications for after-the-fact permits. See 33 C.F.R. Sec. 326.3 & n. 2 (district engineer shall accept application for after-the-fact permit for unauthorized filling unless state or local enforcement action is pending, and "[t]his exception to the general rule of accepting after-the-fact applications should be used on a limited basis, only for those cases which merit special treatment"). Therefore, the question is moot.
 
 
 54
 The problem before us clearly is not "capable of repetition, yet evading review." See Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969) (case concerning burden placed on nomination process for statewide office was not moot but was "capable of repetition, yet evading review," because same restriction on plaintiff's candidacy that had adversely affected him in 1968 could do so in 1972 election); International Longshoremen's and Warehousemen's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954) (declaratory judgment vacated because questions of scope and constitutionality of legislation must not be decided "in advance of its immediate adverse effect in the context of a concrete case."). We should not pass unnecessarily on the constitutionality of the Corps regulation. The declaratory judgment of the District Court is therefore vacated and the claim dismissed.APPENDIX[5]
 
 
 55
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEOn Rehearing
 
 
 56
 No member of the Court having moved for en banc consideration of this case and the panel being of the view that reconsideration is not warranted, the government's petition, as supported by amicus curiae organizations, is hereby denied.
 
 
 57
 By an unusual construction of the words "navigable waters" in the Clean Water Act, the government and organizations filing as amicus curiae would apparently have the Court by injunction prevent the owner from using low lying land areas where water sometimes stands and where vegetation requiring most conditions grows. Such low lying lands would be converted into "navigable waters" by the Court without regard to either their proximity to navigable waters, streams or seas or the inundation of such lands by such navigable waters. Under such a construction law lying backyards miles from a navigable waterway would become wetlands. Neither the government nor amicus suggests an adequate limiting principle. Such a construction is over broad and inconsistent with the language of the Act in question, and the Court declines to adopt such a construction.
 
 ENTERED BY ORDER OF THE COURT
 
 
 [1]
 For a pictorial depiction of the property, see the Appendix to this opinion
 
 
 [2]
 The term "Territorial seas" is defined as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." Id. Sec. 1362(8)
 
 
 [3]
 There was evidence adduced during the evidentiary hearing which strongly indicated that the Riverside land may fit within this category of land which is "not aquatic but experience[s] an abnormal presence of aquatic vegetation." Not only was the land farmed for many years, it has been established that there are many species of vegetation growing there now that could not be classified as purely wetlands vegetation. For example, it is significant that on cross-examination by Riverside's attorney, the government's main witness admitted that the "only positive knowledge" he had about the vegetation on the land was that there were cattails. See Government's App. at 75. Furthermore, this witness testified that in addition to cattails, phragmites, marsh grasses and other wetland-type vegetation, he discovered ash, red maple, cottonwood, and sedge on the property. He admitted that these were not necessarily wetland-type vegetation. We do not find that Judge Kennedy's finding that there was a "prevalence" of wetland-type vegetation on the property was clearly erroneous; rather, we simply note that her finding to that effect was based on the old regulation and did not go to the issue of whether the presence of wetland-type vegetation on the land was "abnormal" in the sense that it was supported not by inundation but by unusual soil conditions
 
 
 [4]
 We note that the Fifth Circuit has recently held that the Corps' wetlands definition is consistent with the intent of the Federal Water Pollution Control Act. See Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir.1983)
 
 
 [5]
 Exhibit A, Defendant's Memorandum of Law, United States v. Riverside Bayview Homes, Inc.,, No. 77041 (E.D.Mich.1977)