**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas R. LARKINS and Herbert M.
Larkins, Defendants–Appellants.**

No. 87–5300.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 7, 1988.

Decided July 22, 1988.

Rehearing Denied Sept. 19, 1988.

J. William Phillips (argued), Murray, Ky., for defendants-appellants.

Joseph Whittle, U.S. Atty., Louisville, Ky., James L. Kerr, David C. Shilton (argued), Land & Natural Resources Div., Dept. of Justice, Washington, D.C., Martin W. Matzen, for plaintiff-appellee.

Before MERRITT, KENNEDY and KRUPANSKY, Circuit Judges.

PER CURIAM.

Defendants-appellants Thomas R. Larkins and Herbert M. Larkins (defendants) appealed from the district court's order permanently enjoining them from modify-

ing "wetlands"[1] adjacent to the Obion Creek in Carlisle County, Kentucky, ordering them to restore wetlands they had earlier destroyed, and imposing a penalty of $40,000.[2] The record disclosed the following facts.

This action arose out of alleged violations of Section 301(a) of the Clean Water Act (CWA), 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants, including fill dirt, into navigable waters of the United States and the fresh water wetlands adjacent thereto without first obtaining a permit from the Secretary of the Army, Army Corps of Engineers. 33 U.S.C. § 1344(a). The defendants, brothers, acquired 550 acres of land in the flood plain of Obion Creek, a tributary of the Mississippi River[3] in Carlisle County, Kentucky in 1976. When they purchased the land, Thomas Larkins noted that 10–12 acres were covered with knee deep water. After acquisition of the land, the defendants dug drainage ditches, cut timber, blasted beaver dams, and began filling low spots. In 1980, the defendants began constructing dikes and levees on the land. On February 1, 1982, the Corps notified the defendants that its aerial inspection disclosed that the defendants had been discharging materials into approximately 110 acres of the land which the Corps believed were classified as wetlands subject to the CWA. The defendants nevertheless completed the dikes and levees. The levees formed an 18 acre impoundment or pond, which collected much of the water that previously saturated the land.

On February 10, 1984, the United States commenced the present action in the United States District Court for the Western District of Kentucky alleging CWA violations as a result of the construction of the dikes and levees. At trial, the government introduced a number of aerial photographs showing standing water on the land where the impoundment was eventually constructed and the land northeast thereof. The defendants acknowledged that much of this land was covered by standing water, but attributed that condition to beaver activity. Photographs taken in 1972 and 1979 also revealed that this area was forested and contained numerous sloughs and depressions which collected standing water.

The government presented three expert witnesses to identify the vegetation depicted in the various aerial photographs. These experts had been trained in identifying vegetation from aerial photographs by its "signature," i.e., the color, shade, tint, and texture of the vegetation. Martin Keller (Keller) testified that the area was "an area of black willow, buttonbush and several different species of herbaceous aquatic and semi-aquatic plants." Keller further testified that a 1980 photograph was "typical of the many thousands of similar sites that we have seen over the last 10 years of areas such as this, and in every case these areas have been classified as wetlands."

Thomas Welborn (Welborn) of the U.S. Environmental Protection Agency, testified that he had inspected the land in 1984 and discovered an undisturbed area of vegetation consisting of spike rush, wild millet, and nut sedge, all vegetation indicative of

1. The United States Army Corp of Engineers' regulations defines wetlands as follows:
    (b) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
    33 C.F.R. 328.3(b) (formerly 33 C.F.R. 323.2(c)).

2. Under the district court's order of March 16, 1987, the penalty will be lifted if defendants complete the restoration within six months of this court's disposition of this appeal.

3. Under the CWA, the term "'navigable waters' means waters of the United States...." 33 U.S.C. § 1362(7). In regulations promulgated by the Environmental Protection Agency and the Army Corps of Engineers, "waters of the United States" are defined to include tributaries of navigable waters and the wetlands adjacent to such tributaries. 33 C.F.R. § 328.3(a)(5) & (7) (formerly 33 C.F.R. § 323.2(a)(5) & (7)). See also 40 C.F.R. § 230.3(s)(5) & (7). Because the defendants did not argue that the CWA does not permit the Army Corps of Engineers to exercise its regulatory jurisdiction over wetlands adjacent only to tributaries of navigable waters, this court does not decide that issue.

wetland conditions. Welborn testified that in a 1980 aerial photograph the signature of this area was the same as the area where the impoundment is now located and the land northeast thereof. Welborn therefore concluded that the entire area was wetlands in 1980.

In 1980, a forested area was located due east of what is now the impoundment which forest was subsequently cleared by the defendants. Expert David Parsons (Parsons) examined aerial photographs of this area and concluded that it was "palustrum forested broadleaf deciduous seasonally inundated wetlands."

Another government expert witness, Charles Newling (Newling), dug soil samples in 1984 in the northeast area and concluded from the reduced amount of oxygen in the soil that in the past 2,000 years the soil had developed under wetland conditions. Parsons acknowledged that this oxygen test was incapable of disclosing whether the area had been wetlands for the last 200 years. Welborn took a soil sample east of the impoundment and reached a similar conclusion. An official Carlisle County Soil Survey compiled by the U.S. Department of Agriculture in 1937 indicated that the entire area north and east of the impoundment was composed of Waverly and Falaya soils which are "hydric" or wetland soil types.

With regard to the land southwest of the impoundment, Newling testified that during a court ordered inspection of the land in May, 1985, he observed water marks or silt marks on the trees approximately 30 inches above ground level. Keller, Welborn, and Parsons all conducted a vegetation survey of this area and discovered that the predominant vegetation in this area was that which thrived in saturated soil ("group 1 vegetation") and that which could tolerate saturated soil ("group 2 vegetation").[4]

Newling conducted soil tests on this area of land and concluded that this soil also developed under wetlands conditions. Newling also observed that water filled the sample holes while he was taking samples in this area.

The defendants introduced the testimony of two local farmers who stated that flood waters on the property tended to drain away quickly. On cross-examination, both witnesses agreed that, before being purchased by the defendants, the land tended to be covered by standing water.

Following a bench trial, the district court found that the 110 acres in dispute were indeed wetlands subject to regulation under the CWA. The court further concluded that the defendants' construction activities were not entitled to the "farm exception" under 33 U.S.C. § 1344(f) which exempts normal farming activity from the permit requirement so long as no "discharge of dredged or fill material into the navigable waters incidental to any activity [has] as its purpose bringing an area of the navigable waters into a use to which it was not previously subject...." 33 U.S.C. § 1344(f)(2). The court determined that the defendants "constructed the dikes and levees for the purpose of bringing the wetlands adjacent to Obion Creek under cultivation, a use to which the site was not previously subject," and that they were not therefore entitled to the exemption. Their failure to obtain a permit before constructing the dikes and levees was, therefore, in violation of the CWA. *United States v. Larkins*, 657 F.Supp. 76 (W.D.Ky.1987). The defendants thereafter commenced this timely appeal.

---

4. The Corps' Memphis District Guidelines, developed by Keller, divided vegetation into three groups:

*Group 1.* These species are considered to be the most water tolerant woody species in the District. While the presence of these species on a site does not insure the presence of wetlands, these species are generally consistent as to the sites where they are commonly found (swamps, sloughs and backwater flats).

*Group 2.* This group includes those species that, while showing varying degrees of adaptation to life in saturated soil conditions, may also be commonly found on more mesic sites which would not be considered wetlands.

*Group 3.* These species may on occasion be found in wetlands but are not considered to be typically adapted for life in saturated soil conditions (where these species are well established, wetlands are not present).

On appeal, defendants first asserted that the district court erred in concluding that the land in question was "wetlands" as defined in 33 C.F.R. § 328.3(b) prior to 1980 because the court failed to examine the amount and frequency of the soil's saturation, i.e., its "hydrology," in making its determination. This assignment of error is without merit. In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court rejected the notion that 33 C.F.R. § 328.3(b) required that land be frequently inundated to be considered wetlands and concluded that the regulation's only requirement was that "the saturation is sufficient to and does support wetland vegetation." 474 U.S. at 130, 106 S.Ct. at 461. The presence of vegetation that requires saturated soil conditions for growth and reproduction on land adjacent to a body of navigable water is sufficient to bring the land under the regulation's definition of "wetlands." 474 U.S. at 130–31, 106 S.Ct. at 461. *See also United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1154 (1st Cir.1987) ("[T]he Corps further extended its jurisdiction over wetlands by eliminating the requirement that the wetland be periodically inundated, requiring only that it be inundated or saturated by surface or groundwater at a sufficient frequency to support vegetation adapted for life in saturated soils."), *cert. denied*, —— U.S. ——, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988). Accordingly, the district court properly found that the land adjacent to the Obion Creek was "wetlands" under 33 C.F.R. § 328.3(b) because it was sufficiently saturated to and did support wetland vegetation. Furthermore, given the evidence summarized above, the finding that the land was sufficiently saturated to and did support wetland vegetation was not clearly erroneous. Fed.R.Civ.P. 52(a).

The defendants also argued that the district court erroneously concluded that they were not entitled to the "farm exception" under 33 U.S.C. § 1344(f), which provides, in part:

(1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

\* \* \* \* \* \*

is not prohibited by or otherwise subject to regulation under this Section....

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as *its purpose bringing an area of the navigable waters into a use to which it was not previously subject,* where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

(emphasis added) The district court concluded that because the land had not previously been used as farmland, the defendants were not entitled to the farm exception. Aerial photographs taken before the dikes and levees were constructed showed pooled water and inundated areas and that much of the land was covered by trees. There was no evidence that the land in question had been cultivated for farming.

Defendants nevertheless asserted the land was used for "silviculture," i.e., tree farming, and that when they cleared the land, they were merely harvesting trees. Trees were not replanted, they asserted, because they merely made an economic decision to plant more profitable crops, i.e., soybeans, after the trees had been removed. This argument is without merit. The silviculture exception contained in 33 U.S.C. § 1344(f)(1)(A) applies to the *normal* harvesting of timber, not to the activity of clearing timber "to permanently change the area from wetlands into nonwetland agricultural tract for row crop cultivation." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 n. 46 (5th Cir.1983) (citations omitted). *See also* 33 C.F.R. § 323.4(c) ("[A] permit will be re-

quired for ... the conversion of a wetland from silviculture to agricultural use when there is a discharge of dredged or fill materials into waters of the United States in conjunction with the construction of dikes, ditches or other works or structures used to effect such conversion."). Consequently, the district court did not err in determining that the defendants were not entitled to the farming exception.

This court has considered defendants' remaining assignments of error and concludes that they are without merit. Accordingly, the judgment of the district court is hereby AFFIRMED.[5]

MERRITT, Circuit Judge, concurring.

I want to make an issue clear that the landowner at oral argument expressly declined to raise. I mention it simply to make it clear that we do not reach the issue.

The Clean Water Act does not mention "wetlands," nor does it use any language which explicitly includes "wetlands." Instead, it defines the pollution jurisdiction of the Corps of Engineers as limited to "navigable waters," *see* § 404 of the Clean Water Act, 33 U.S.C. § 1344.

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court defined the "navigable waters" jurisdiction of the Corps to include "wetlands" adjacent to "navigable" or "open waters," even though the wet area is not caused by flooding or ground water flowing from the adjacent waters. 106 S.Ct. at 462. The Supreme Court arrived at this expansive interpretation by pointing to the legislative history of § 404, which indicates, in a general way, a desire to adopt legislation for the "protection of aquatic ecosystems." *Id.*

The Supreme Court's actual holding in *Riverside Bayview Homes* is limited, however, by the important fact that the "wetlands" in question in that case were "located *adjacent to a body of navigable water*, since the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to Black Creek, *a navigable waterway."* *Id.* at 461 (emphasis added). In footnote 8 of its opinion, the Supreme Court reserved the question of the jurisdiction of the Corps of Engineers under § 404 over "wetlands that are not adjacent to bodies of open water." *Id.* at 461 ("[w]e do not express any opinion on that question").

Had the landowners at oral argument not said that they do not raise the issue, this case would present the issue the Supreme Court reserved in *Riverside Bayview Homes.* Obion Creek, so far as we can tell from the record before us, is a small nonnavigable creek or stream that empties into the Mississippi River many miles away. The land at issue in this case is adjacent to Obion Creek. The Corps of Engineers, as plaintiff, had the burden in this case of proving that the land in question is adjacent to a "body of open water," the phrase used by the Supreme Court in footnote 8 of *Riverside Bayview Homes.*

If this is true, then the Corps has now expanded the definition of "navigable waters" to include any creek or stream or moist area. It has arrived at the precise point predicted in our earlier opinion in the *Riverside Bayview Homes* case, which the Supreme Court reversed. There we said: "Under such a construction [as proposed by the Corps of Engineers] low lying backyards miles from a navigable waterway would become wetlands." *United States v. Riverside Bayview Homes, Inc.*, 729 F.2d 391, 401 (6th Cir.1984), *rev'd*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The Corps' definition has apparently detached and untied the "wetlands" jurisdiction of the Corps from any concept of "open waters" or navigable waters. A farmer's low lying farmland or a homeowner's low lying backyard—adjacent to a small stream or creek but many miles from any navigable waterway—has apparently been converted

5. The defendants are free, of course, to move the district court to stay its order requiring the restoration of wetlands pending their proper application for a permit. Such a stay would, in the event that a permit was issued, prevent the needless destruction of the significant work that went into transforming the wetlands in question into productive farm land.

into government property no longer subject to control or improvement by the owner without government permission. A statute that does not mention "wetlands" has apparently been read to include simply "moist land adjacent to a creek."

The framers of the Constitution were solicitous of the rights of landowners—especially small farmers struggling for survival—not to have land appropriated by the government. They therefore adopted the provision of the Fifth Amendment of the Constitution prohibiting the taking of private property for public use without just compensation. Although the Supreme Court has stated that "[a] requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense," 106 S.Ct. at 459, the injunction the Corps has been granted in this case will force the Larkins to destroy the terracing work they have done on their land and to restore the land to its original nonagricultural use. Because farming appears to be the only economically viable use of the land in question, *see Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), it is arguable that the Larkins could successfully assert a takings claim if they are not allowed to keep the work they have already done. *See Riverside Bayview Homes,* 106 S.Ct. at 460 n. 6 ("Because the Corps has now denied respondent a permit to fill its property, respondent may well have a ripe claim that a taking has occurred.") It is arguable that the injunction issued in this case constitutes a taking without compensation. Since the landowner has not raised this issue and at oral argument expressly declined to raise any question about whether Obion Creek is navigable, or constitutes "open waters," the Court's opinion should not be read to decide this issue.