945 F.2d 405
 34 ERC 1353
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William J. SMEREKA, Plaintiff-Appellant,
v.
John D. GLASS, Defendant-Appellee.
 No. 90-1649.
 United States Court of Appeals, Sixth Circuit.
 Sept. 24, 1991.
 
 Before KENNEDY and MILBURN, Circuit Judges, and WILHOIT, District Judge.*
 PER CURIAM:
 
 
 1
 Plaintiff appeals summary judgment for defendant in this action seeking a permit to fill a wetland under the Clean Water Act, 33 U.S.C. § 1344 et seq., and the Rivers and Harbors Act, 33 U.S.C. § 403 et seq. Plaintiff raises three issues on appeal: 1) whether the United States Army Corps of Engineers (the "Corps") properly conducted the three-parameter test to determine the presence and extent of wetlands; 2) whether the District Court erred in determining that the Corps' decision to deny plaintiff's application for a permit to fill a wetland was not arbitrary and capricious; and 3) whether the District Court erred in determining that evaluation of practical alternatives should focus on alternatives available at the time the property was purchased and not at the time of the application. For the following reasons, we AFFIRM.
 
 I.
 
 2
 Plaintiff owns property containing wetlands on the Trenton
 
 
 3
 Channel of the Detroit River, Grosse Ile, Michigan. On
 
 
 4
 November 26, 1986, plaintiff filed applications with the
 
 
 5
 Corps and the State of Michigan Department of Natural
 
 
 6
 Resources[1] ("DNR") seeking permission to fill a
 
 
 7
 wetland owned by him. Plaintiff sought to obtain the
 
 
 8
 necessary permits in order to construct a bulkhead at the
 
 
 9
 river's edge and to fill at least a portion of the wetlands
 
 
 10
 to construct a house. Joint App. at 192 (map depicting
 
 
 11
 plaintiff's property with proposed construction site and
 
 
 12
 approximate boundary of wetland areas) and 198.
 
 
 13
 Pursuant to this application, the Corps, which has jurisdiction over wetland areas, 33 U.S.C. § 1344, made two preliminary site visits on April 7, 1987 and June 10, 1987, and conducted a formal visit on July 1, 1987. During the formal visit the Corps conducted a test referred to as the "three-parameter test" to determine the presence and extent of wetlands. The three-parameter test requires an examination of the species of vegetation, the soil condition, and the hydrology at a particular site. A property is considered a wetland if all three of these factors show wetland characteristics.
 
 
 14
 A written report was prepared based on this inspection. Joint App. at 71. With respect to vegetation, the inspector found three species of facultative wet trees, along with two species of facultative or facultative wet saplings and shrubs on the property.[2] All of the plant species on the property were considered obligate, facultative wet or facultative plants. Two soil samples were taken in representative locations in the upland and wetland areas and were classified as Pewamo, a hydric soil. Photographs of the two soil pits documented this assessment. Finally, the inspector observed that the soil was saturated up to a depth of six inches and determined that this was within a normal range of conditions for this property.
 
 
 15
 These findings formed the basis of an Environmental Impact Assessment dated December 2, 1987, which concluded that plaintiff's property was comprised of 0.5 acres of wetlands and that the proposed fill plan would be detrimental to the wetland areas. Id. at 84. The Corps denied plaintiff's application for a permit on December 16, 1987. Id. at 96. Plaintiff subsequently made several requests for reconsideration which were also denied.
 
 
 16
 The Corps examined plaintiff's property numerous times subsequent to this denial, although these visits were not always for the purpose of defining the wetland areas. On April 13, 1988, the Corps took aerial photographs of plaintiff's property. On August 11, 1988, the Corps, acting on information it had received, dispatched an inspector to plaintiff's property in order to determine compliance with relevant laws. The inspector found that plaintiff was clearing trees and other vegetation as well as placing woodchips into previously identified wetlands. Id. at 101-03 (Inspectors Report). Plaintiff was informed that dumping woodchips into wetlands was a violation of law, and plaintiff discontinued this practice. A follow-up visit was conducted on September 22, 1988 to verify that plaintiff had removed the woodchips. Id. at 106.
 
 
 17
 On February 6, 1989, plaintiff submitted to the Corps a request to reactivate his application file. The request outlined two alternatives to the originally proposed fill plan. On April 20, 1989, the Corps visited plaintiff's property. At the time of the inspection, the inspector noted that it had not rained for several days prior to the inspection. Id. at 307. The inspection revealed that ponding surface water was present on the site; that the soil was saturated; and that the grass was growing in dark, organic muck. Id. However, no wetlands tests were done; only a visual inspection of the wetland areas was conducted. Id. The Corps reiterated its conclusion that a portion of plaintiff's property constituted wetlands. Thereafter, an addendum to the Environmental Impact Assessment was prepared which once again stated that plaintiff's proposed construction site for his house was located in a wetlands area. Id. at 315. The Corps notified plaintiff on September 19, 1989 that the original denial of his application remained in effect.
 
 
 18
 During the course of his application process, plaintiff hired three environmental experts to conduct site surveys. Drawings were prepared by these consultants, all of which delineated a smaller wetland area--0.20 to 0.30 acres--than that delineated by the Corps. Id. at 315. However, these experts confirmed that the proposed construction site of plaintiff's house was in the wetland areas. Further, none of these consultants produced any field notes which contradicted any findings made by the Corps.
 
 
 19
 On July 7, 1989, plaintiff filed a complaint in District Court seeking review of the Corps' decision to deny his application for a permit. Defendant moved for summary judgment and plaintiff moved for issuance of a permit. A hearing on these motions was held before a magistrate who recommended to the District Court that the motion for summary judgment be granted. The District Court accepted the magistrate's report and recommendation and granted defendant's motion for summary judgment. This appeal ensued.
 
 II.
 
 20
 The standard of review of an agency's decision is set out in section 706 of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), which provides for a limited review by this Court:
 
 
 21
 Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
 
 
 22
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted). The agency's decision is entitled to a presumption of regularity and will be upheld unless a thorough inspection of the record reveals no discernable rational basis for the agency's action. Id. at 415; Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir.1983); Motor and Equip. Mfrs. Ass'n, Inc. v. EPA, 627 F.2d 1095, 1105 (D.C.Cir.1979), cert. denied, 446 U.S. 952 (1980).
 
 
 23
 Plaintiff's first contention is that the Corps conducted the three-parameter test in a manner that failed to adequately define the boundaries of the wetland areas. Of its numerous visits, the Corps only conducted the three-parameter test on one occasion, the inspection of July 1, 1987. In conducting the test, the Corps classified the vegetation at three points on the property and took soil samples at two points, both points which allegedly were in uncontested areas of the boundary line of the wetland areas. Thus, the Corps, by administering the three-parameter test in this manner, established what the Corps itself admits is only an "approximate" wetlands boundary. Plaintiff alleges that the application of the test in this manner resulted in a wetlands' boundary determination that is unwarranted by the facts, constitutes an abuse of discretion and significantly impacts on his ability to use his property.
 
 
 24
 Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, makes it unlawful, inter alia, to excavate from or fill in "any navigable water of the United States" without a recommendation by the Chief of Engineers and authorization from the Secretary of the Army. The Clean Water Act of 1977, as amended, 33 U.S.C. §§ 1251 et seq., prohibits discharge of any "pollutant", including any dredged material or solid waste, 33 U.S.C. § 1362(6); 33 C.F.R. § 323.2(c)-(f), into "waters of the United States" which includes adjacent wetlands, 33 C.F.R. § 328.3(a)(7), (b) and (c). The term "wetlands" is defined at 33 C.F.R. § 328.3(b):
 
 
 25
 [T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
 
 
 26
 In the instant case, the Corps determined the presence and extent of the wetlands by employing the three-parameter test. Courts have recognized the validity of this test to determine whether an area is wetlands. See, e.g., United States v. Malibu Beach, Inc., 711 F.Supp. 1301 (D.N.J.1989); Avoyelles, 715 F.2d at 917-18; and United States v. Larkins, 657 F.Supp. 76, 80-84 (W.D.Ky.1987), aff'd, 852 F.2d 189 (6th Cir.1988), cert. denied, 489 U.S. 1016 (1989).
 
 
 27
 With respect to the soil samples, the Federal Wetlands Manual recommends that a representative pit be dug, photographed and recorded in each plant community type. Federal Wetlands Manual at 32. The inspectors dug two pits, one in the uplands area and one in the wetland areas. See Joint App. at 76 (map with soil sample locations marked). Both of these pits were photographed and the data recorded in the site inspection report. Id. at 83.
 
 
 28
 Plaintiff argues that the Corps should have dug more soil samples. We do not agree. As an initial matter, plaintiff does not point to any authority which requires the Corps to establish the precise wetlands boundary by taking multiple soil samples. More importantly, a soil sample is but one factor in the three-parameter test. The Corps did not determine the boundary of the wetland areas based solely on this one factor, but considered the results from the other two criteria, hydrology and vegetation. Thus, taking the minimum number of required soil samples is not unreasonable, and does not lead to an arbitrary or capricious agency decision if the other factors in the test support the Corps' conclusions.
 
 
 29
 The hydrology of the soils was examined in each plant community. The examination revealed a saturation in the wetlands to a depth of 6" on July 1, 1987. Visual examinations revealed standing water on the Smereka property in July 1987 and April 1989.
 
 
 30
 The property's vegetation was examined from three vantage points,[3] which revealed that 100% of the dominant plant species within the relevant area were either obligate, facultative wet or facultative plants. All of these plants are wetland indicators under the Corps' regulations. Avoyelles, 715 F.2d at 915. We have previously rejected the idea that an area must be frequently inundated to qualify as wetlands and that "[t]he presence of vegetation that requires saturated soil conditions for growth and reproduction on land adjacent to a body of navigable water is sufficient to bring the land under the regulation's definition of 'wetlands.' " Larkins, 852 F.2d at 192.
 
 
 31
 Plaintiff submitted the conclusions of three experts which show that the wetland area is less inclusive than that found by the Corps. The District Court discounted the conclusions of these experts because no evidence was introduced to show that their conclusions were based upon a properly conducted three-parameter test. This finding is not clearly erroneous. Accordingly, the conclusions of these experts do not demonstrate that the determination by the Corps as to the presence and extent of wetlands is arbitrary and capricious.
 
 
 32
 Further, even if the boundary of the wetlands were to be reduced in accordance with the recommendations of these experts, it would be unavailing to plaintiff. Plaintiff's home would still be constructed within the wetland areas. See Joint App. at 131 (stating in his application that "[t]he wetland in the interior of the property is essentially centered where Applicant seeks to place his proposed residence") and 192 (map depicting proposed location of residence); Appellant's Reply Brief at 9 (acknowledging that "the lot Appellant needs to fill in order to build a house is [a wetland]" although an artificial one).
 
 
 33
 Plaintiff also introduced the findings of these experts to argue that the Corps lacked jurisdiction over the wetland areas because of its de minimus nature. See id. at 119 and 130. However, the relevant statutes make no exception to the Corps' jurisdiction basd on the size of the wetlands. Hence, this argument is without merit.
 
 
 34
 In sum, the Corps conducted the three-parameter test in a reasonable manner. The record supports the conclusions reached by the Corps. Their actions and conclusions were not arbitrary or capricious. We therefore conclude that plaintiff's first argument is without merit.
 
 
 35
 Plaintiff next contends that the Corps acted arbitarily and capriciously when it denied his application. Plaintiff advances four arguments. First, the Corps erroneously concluded that plaintiff's proposal did not constitute "water dependent" activity. Second, the Corps should have developed a plan which would allow plaintiff to use the wetlands, rather than rejecting any possible use in favor of construction in a non-wetland area. Third, a permit should have been issued because of the unavailability of other waterfront lots and because of the economic hardship to plaintiff which would otherwise result. Fourth, the Corps failed to adequately evaluate all of plaintiff's proposals under a proper public interest review.
 
 
 36
 Section 404 of the Clean Water Act (the "Act"), 33 U.S.C. § 1344(a), authorizes the Corps to issue a permit to allow the discharge of dredged or fill material into those waters governed by the Act. The section 404 permit process is governed concurrently by Corps guidelines, 33 C.F.R. Parts 320-29, and by EPA guidelines, 40 C.F.R. Part 230. Friends of the Earth v. Hintz, 800 F.2d 822 (9th Cir.1986). Both sets of regulations must be met before a permit will be issued. 33 C.F.R. §§ 320.3(f), 320.4(a)(1).
 
 
 37
 Section 320.4 of 33 C.F.R. sets forth the general policies to guide the Corps in its evaluation of permit applications for fill activities. The regulations require the Corps to conduct a public interest review, balancing the "benefits which reasonably may be expected to accrue from the proposal" against its "reasonably foreseeable detriments" with consideration for the "national concern for both protection and utilization of important resources." Id. § 320.4(a)(1). A permit will be granted unless the district engineer determines that issuance would be contrary to the public interest. Id.
 
 
 38
 A section 404 permit must also comply with relevant EPA regulations. Id. The EPA regulations provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). In discussing practicable alternatives, these regulations distinguish water-dependent activities from nonwater-dependent activities, concluding that practicable alternatives for nonwater dependent "are presumed to be available, unless clearly demonstrated otherwise." Id. § 230.10(a)(3).
 
 
 39
 A water-dependent activity is one which requires access or proximity to a special aquatic site in order to fulfill its basic purpose. Id. In the instant case, the Corps implicitly rejected plaintiff's characterization that his proposal was water dependent when it concluded that "[p]racticable alternatives include selection of another site for home construction that is not a wetland or special aquatic site." Joint App. at 96. In light of the regulatory definition and plaintiff's proposed construction of residential housing, the Corps' conclusion that plaintiff's proposal involved nonwater-dependent activities is not irrational.
 
 
 40
 Plaintiff's other arguments are without merit. The remaining arguments essentially ask this Court to re-weigh the evidence considered by the Corps. This is not our function on review. Our review is limited to determining whether there is a rational basis for the agency's decision. The record demonstrates that the Corps was aware of plaintiff's potential hardships when it decided to reject his application for a permit. Further, plaintiff was aware of the legal hurdles and potential hardships when he purchased the lot. The Corps provided a rational basis for its decision which is supported by the facts. Thus, plaintiff's second argument is without merit.
 
 
 41
 Finally, plaintiff argues that the evaluation of practicable alternatives should focus on the possibilities available at the time of his application for a permit. Relying on Bersani v. Robichaud, 850 F.2d 36 (2d Cir.1988), cert. denied, 489 U.S. 1089 (1989), the District Court concluded that the evaluation of alternatives should focus on the possibilities available at the time the property was purchased, the so-called "market entry approach."
 
 
 42
 We need not address the merits of this issue. Neither the original Environmental Impact Assessment, dated December 2, 1987, Joint App. at 84-95, nor its addendum, dated June 8, 1989, id. at 314-15, specifically analyzed practicable alternatives using a market entry approach. Indeed, the denial of plaintiff's application was based on practicable alternatives which existed at the time of plaintiff's application.
 
 The Assessment stated:
 
 43
 The proposed discharge fails to comply with the 404(b)(1) Guidelines because a practicable alternative to the proposed discharge is presumed to exist (i.e. construction of a home at an upland site, or development of the upland portion of the site only, with minimal fill in the wetland for access ) that would have less adverse effect on the aquatic ecosystem and would not have other significant adverse environmental consequences.
 
 
 44
 Id. at 95 (para. IV) (emphasis added). These reasons were reiterated to plaintiff in a letter which rejected his application. Id. at 96. Hence, addressing this issue would not have any impact on plaintiff's legal rights because the Corps did account for present practicable alternatives but nevertheless rejected plaintiff's application.
 
 III.
 
 45
 For these reasons, the decision of the District Court is AFFIRMED.
 
 
 
 *
 The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 The DNR denied plaintiff's application for a permit on July 20, 1987. A state permit was subsequently issued after a state administrative law judge concluded that the DNR had failed to process plaintiff's application in accordance with the statutory time limits
 
 
 [2]
 In order for the vegetation criterion to be met, more than 50% of the dominant plant species in an area must fit within at least one of five plant classifications: obligate wetland plants, facultative wetland plants, facultative plants, facultative upland plants, and upland plants. These five classifications of plant life species are associated with wetlands according to the Plant List issued by the United States Fish and Wildlife Service. The probability that an area is wetlands varies with the presence of these species: obligate--99%; facultative wetland--67-99%; facultative--34-66%; facultative upland--1-33%; upland--less than 1%. United States v. Malibu Beach, Inc., 711 F.Supp. 1301, 1307-08 (D.N.J.1989)
 
 
 [3]
 We disagree with plaintiff's characterization that the Corps examined three distinct areas where wetlands' characteristics were not disputed. An examination of the map and accompanying photographs prepared by the Corps, Joint App. at 76-83, shows that the examinations were not conducted of three discrete areas but rather of the entire property from three different vantage points